No. 14,246.

Bedford, State Treasurer *v.* Colorado Fuel and Iron Corporation.
(81 P. [2d] 752)

Decided July 11, 1938.

Mr. BYRON G. ROGERS, Attorney General, Mr. ELMER P. COGBURN, Assistant, for plaintiff in error.

Mr. FRED FARRAR, Mr. WILBUR M. ALTER, for defendant in error.

Mr. BARNEY L. WHATLEY, Mr. WALTER E. SCHWED, amici curiae.

540

En Banc.

Mr. Justice Knous delivered the opinion of the court.

Involved here, upon its petition for a declaratory judgment, is the determination of the tax liability of the Colorado Fuel and Iron Corporation under the Colorado retail sales tax act (S. L. '35, c. 189), and use tax act (S. L. '36, Second Extraordinary Session, c. 11) : (1) Upon hundreds of specific items of tangible personal property said to be necessarily purchased and used by it in its manufacturing and mining operatons; and, (2) upon hospital and dispensary supplies and equipment purchased and used in conducting its hospital, which it claims is a charitable institution specifically exempt under the provisions of the two statutes. The company, a domestic corporation, is engaged in the manufacture of steel and steel products and the operation of coal mines—about one-half of its coal production being used in its steel plant located at Pueblo, Colorado—and in the operation of mines or quarries producing iron ore, fluor spar, dolomite and limestone, all of which are used in connection with the manufacture of steel at the steel plant.

The sales tax act relates to retail sales made in Colorado. The use tax act is supplemental to it and apparently was designed to apply to the use and consumption of commodities elsewhere purchased at retail, which, if purchased in Colorado, would have been subject to the sales tax. The particular portions of the two statutes here pertinent are substantially similar in import because of which, and in furtherance of brevity, we shall use the provisions of the sales tax act as a basis for our conclusions, which will apply to corresponding sections of the use tax act. The controversy upon the first question involved is primarily based upon the diversity of opinion between the parties as to the interpretation to be accorded section 2 (n) of the sales tax act, which reads as follows: ''Sales to and purchases of tangible personal property by

a person engaged in the business of manufacturing, compounding for sale, profit or use, any article, substance or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded or furnished and the container, label, or the furnished shipping case thereof, shall be deemed to be wholesale sales and shall be exempt from taxation under this Act.''

Pursuant to the authority vested in him by section 18 of the act the state treasurer has promulgated rules and regulations for its administration, those relating to section 2 (n), supra, being in part as follows: ''However, sales of tangible personal property to manufacturers, producers, or processors, which tangible personal property is used or consumed but does not enter into the actual processing and does not become an ingredient or component part of the commodity or service manufactured, produced or furnished, are taxable.''

In conformity with this rule the treasurer has demanded the payment of the use tax from the company itself, and the payment of sales tax from the company's vendors, upon whom rests the primary duty of collecting and remitting taxes imposed, upon all tangible personal property purchased and used by the company in connection with the steel production and manufacturing business which does not become an ingredient or component part of the finished product and which is not otherwise exempted by the act. The company contends that in addition to those items of tangible personal property which actually become an ingredient or component part of the commodities manufactured, such tangible personal property as is necessarily used or consumed in the manufacturing process, although not becoming a constituent part of the finished product, is likewise not subject to the tax. Upon this theory the company asserts that the numerous specific commodities and articles enumerated in its complaint, ranging from the hay fed to the mine mules to the refrac-

tories used in the steel furnaces and including machinery and tools, office supplies and equipment, trucks, chemicals, workmen's equipment and many other items, the great majority of which by neither physical nor chemical process ever becomes an ingredient part of the finished articles, are not within the purview of the acts.

The trial court declared that such items of tangible personal property as are directly and proximately used in, and necessary for, the processes of manufacture by the company, as well as those which become an ingredient or component part of the product manufactured, are exempt from taxation under both acts. The original pronouncement by the trial court on the meaning and intent of the acts was made at the request of the parties preliminary to the submission of the case for specific rulings on the various items of property involved. After this preliminary ruling and upon the basis thereof, although both sides excepted thereto, the parties attempted to agree on the taxable status of the enumerated articles, but in this effort they were only partially successful and the matter later was submitted to the court upon stipulated facts resulting in a judgment declaring some of the questioned items taxable and others exempt. Both parties excepted to the final decree and assign error. The treasurer asserts that the trial court erred in connection with the items declared to be not subject to the tax, and the company claims that the decision was erroneous in holding taxable certain specific articles, incuding all mining machinery and equipment, and alleges that the court was mistaken in not exempting the hospital and dispensary supplies and equipment under specific provisions of the act.

While the solution of the first question primarily hinges upon the precise meaning of section 2 (n) supra, we shall proceed under the elementary rule of statutory construction to the effect that all the language of the act must be considered and that construction favored which gives effect to every part thereof. The rule is well stated

in the case of *Paxon v. Cresson G. M. Co.,* 56 Colo. 206, 139 Pac. 531, in the following words: "The fundamental rule to be followed in construing a statute is to ascertain and give effect to the intention of the legislature in adopting it, and give effect, if possible, to every word it contains, and as far as practicable reconcile the terms therein employed so as to render it consistent and harmonious." See, also: *Calhoun G. M. Co. v. Ajax G. M. Co.,* 27 Colo. 1, 59 Pac. 607; *People v. Texas Co.,* 85 Colo. 289, 275 Pac. 896; *Leyden Co. v. Buddy,* 98 Colo. 452, 56 P. (2d) 52; 59 C. J. 993-995, §§594, 595; 25 R. C. L. 1006.

■ As has been said the act is designed to tax retail sales. The general definition of a retail sale is found in section 2 (g) of the act and the definition of a wholesale sale is found in section 2 (e) of the act. These two subsections respectively are:

"(e) The term 'wholesale sale' means a sale by wholesalers to retail merchants, jobbers, dealers, or other wholesalers for resale and does not include a sale by wholesalers to users or consumers, not for resale; and the sales shall be deemed a retail sales, and subject to the provisions of this act."

"(g) 'Retail sale' includes all sales made within the state except wholesale sales."

■ ■ It will be observed that the definitions of "wholesale sale" and "retail sale" pronounced by the legislature for the purpose of the acts, differ materially from the ordinarily accepted general conception of the meaning of these terms. It seems certain from these provisions that the statute was fundamentally intended to impose a tax upon that which is consumed and used and exempts only that which is sold for resale. The controlling factor in the classification is the disposition of the goods made by the buyer, and not the character of the business of the seller or the buyer. The ultimate consumer of all articles purchased and used by a manufacturer in its manufacturing operations is the manufacturer and upon the basis of the definitions alone the manufac-

turer would be liable for the tax on all of such items. It is definitely evident, however, that the legislature had well in mind that in the ordinary course of our complex industrial and commercial systems many articles and commodities are used and consumed by processors and manufacturers for later resale in an altered form. In the event an intermediate sales tax was charged upon the intervening transactions and upon each of the articles involved, consecutive taxes would be pyramided upon the final product offered for resale to the ultimate consumer. The extent to which there should be relief from this condition, certain of occurrence, and the limitations which should apply with respect thereto, were purely matters of legislative discretion. The legislative declaration to meet this situation is contained in section 2 (n) supra. We have heretofore stated the respective constructions placed upon this section by the parties and the trial court. The dispute centers around the words "* * * enters into the processing of *or* becomes an ingredient or component part of the product. * * *." The company contends that to reach the conclusion expressed in the regulations of the treasurer to which reference has been made, the italicized disjunctive "or" must be considered as having the effect of the conjunctive "and," and a considerable portion of the company's brief is devoted to a discussion of this proposition. The attorney general claims that it is not necessary to indulge in this imputed transposition of the meaning of these conjunctions to arrive at the interpretation adopted by the treasurer and agrees that "or" as used here means "or." We are in accord with this view and shall proceed with the consideration of the matter upon the principle that the words quoted consist of two clauses stated in the disjunctive. Upon this basis, not subject to tax payment when all of the other conditions of the section 2 (n) supra, are present, are: (1) Tangible personal property which becomes an ingredient or component part of the product, and, (2) tangible personal property *which enters into the processing of* the product

which is manufactured. No controversy arises between the parties with reference to the articles contained in the first category since their identity can be factually established without difficulty. The real issue hinges upon the legislative intent and meaning—expressed in the words "enters into the processing of." If these words mean that to be exempt from taxation such articles or commodities must become a constituent part of the finished product, in the course of its processing or manufacture, the position of the treasurer must be upheld; otherwise, a broader construction must prevail. Although the treasurer asserts that the language under consideration is ambiguous, and upon this basis seeks to invoke various rules of construction, we proceed upon the premise that this assumption is unwarranted. Mere awkwardness of expression, or an ill-advised choice of terms, do not necessarily make a writing ambiguous.

 "Whether we are considering an agreement between parties, a statute or a constitution, with a view to its interpretation, the thing we are to seek is the thought which it expresses. To ascertain this, the first resort in all cases is to the natural signification of the words employed, in the order and grammatical arrangement in which the framers of the instrument have placed them. If thus regarded the words embody a definite meaning, which involves no absurdity, and no contradiction between different parts of the same writing, then that meaning apparent upon the face of the instrument is the one which alone we are at liberty to say was intended to be conveyed." *Newell v. People,* 7 N. Y. 9, 97. This language was quoted by Mr. Cooley in his work on Constitutional Limitations, and by us in *People ex rel. v. May,* 9 Colo. 80, 85, 10 Pac. 641.

 In the current dictionaries the word "enter," and particularly the phrase "enters into" are defined as follows:

Webster's International Dictionary, second edition: "enter" "(6) To form a constituent part; to become a

part or partaker; to impenetrate; share;—with *into;* as, tin enters into the composition of pewter."

New Century Dictionary: "to enter into." "* * * to form a constituent part or ingredient of (as lead *enters into* the composition of pewter.)"

The New Century Dictionary: "To enter into; to be an ingredient in; or a constituent part in; as lead enters into the composition of pewter."

It will thus be observed that in the ordinarily accepted sense as applied to the question under consideration the word "enter" used with the preposition "into" implies that the thing which enters impenetrates and becomes a part and ingredient of the thing produced. The Standard Dictionary defines "processing" as "a course or method of operations." The Century Dictionary expresses the meaning as "an action, operation or method of treatment applying to something." Webster defines the term as "a series of actions, motions or occurrences; progressive act or continuous operation or treatment; a series of operations leading to some result; as a process of manufacture." Applying these definitions to the words under consideration it would seem certain they mean that to enter into the processing of an article, substance or commodity, tangible personal property must of necessity become a constituent part of such final product in the series of continuous operations and treatment leading to this result.

Entitled to consideration as expressive of the intent of the legislature in connection with this subject is section 2 (o) of the act of 1935, which reads as follows: "Sales and purchases of electricity, coal and gas for use in processing, manufacturing, mining, refining, irrigation, building construction, telegraph, telephone and radio communication, street and railroad transportation services and all industrial uses shall be deemed to be wholesale sales and shall be exempt from taxation under this Act."

While this section exempts gas and electricity, which might be considered as not being tangible property, and

broadens the group of activities to which the exemption would apply, it nevertheless, when used in processing and manufacturing, exempts coal, which is clearly tangible personal property. The legislature could have had no purpose in the adoption of this provision in so far as it relates to coal, if the contention of the company is correct.

 Further supporting our view in the matter is the circumstance that after the rule of construction promulgated by the treasurer had been in force for almost two years, the legislature reenacted the present sales tax law, chapter 230, S. L. 1937, making no change whatever in section 2 (n) of the act. Likewise, no change in the provisions here involved was made by the amendment of the use tax act, S. L. 1937, p. 1075. Presumptively at the time the legislature adopted the 1937 acts it was aware of the construction theretofore given the previous statutes and was satisfied therewith. These reenactments, therefore, in effect amounted to a legislative confirmation of the prior existing rules of interpretation. *McFeeley v. Commissioner,* 206 U. S. 102, 56 Sup. Ct. 54, 80 L. Ed. 83; *Helvering v. Bliss,* 293 U. S. 144, 55 Sup. Ct. 17, 79 L. Ed. 246; *United States v. Safety Car Heating Co.,* 297 U. S. 88, 56 Sup. Ct. 353, 80 L. Ed. 500; *Williams v. Burnet,* 59 Fed. (2d) 357, 358; *Brewster v. Gage,* 280 U. S. 327, 337, 50 Sup. Ct. 115, 74 L. Ed. 457; *Poe v. Seaborn,* 282 U. S. 101, 117, 51 Sup. Ct. 58, 75 L. Ed. 239; *Universal Battery Co. v. U. S.,* 281 U. S. 580, 50 Sup. Ct. 422, 74 L. Ed. 1051.

 In the interpretation of a statute the legislative purpose sought to be accomplished by the enactment is always to be borne in mind. If the company's construction is adhered to, any agency, comprising tangible personal property, which by any circumstance, and however remote, is used or employed in the process of manufacturing the finished product, is exempt from the operation of the acts. An unlimited adherence to this rule would automatically exempt from taxation substantially all personal property purchased and used by a manufacturer in the manufacturing operation and yet leave mercantile and

merchandising establishments and other similar businesses engaged in resale operations, liable for these taxes upon trucks, equipment, machines, store fixtures and other personal property purchased by them and necessarily used in the conduct of their businesses. We cannot presume the legislature intended such a result. Possibly with these things in mind the trial court attempted to place a restriction upon the construction of the company to the extent of declaring that to be exempt the articles must be *proximately* used in connection with the manufacturing operations. This interpretation merely imposed a rule of relativity, which clearly is not warranted by the terms of the act nor by any implication which can be drawn therefrom. The attempted application of such a rule would leave the administration of the act, the officers charged with this duty, and the taxpayers in a state of marginal uncertainty in that as to each of the divers articles purchased or used in connection with any manufacturing business, the degree of proximity to the final product which would control the tax status could not be ascertained by any definite formula. This situation is well exemplified by the experience of the parties to this proceeding. After the original pronouncement of the trial court, and upon the basis thereof, the parties made a bona fide attempt to agree upon the taxable status of the specific items involved in this proceeding but were unable so to do. The trial court then proceeded to a classification of the list upon stipulated facts as to the part played by each item in the manufacturing operation, with the result that both parties now are before us complaining that as to various articles the court erred in the application of its announced interpretation. By way of example; the trial court exempted hand tools used in the process of manufacturing, but declared taxable hand tools and other tools used in the maintenance, repair and adjusting of exempted machinery and equipment in and about the plants of the company. Likewise, oils and greases used for general lubrication of machines devoted to the processes of manu-

facturing were exempted, while belt dressing for belts, presumably used upon these identical machines, was held to be taxable. Other similar apparently inconsistent situations appear in the record and we mention these merely to show the difficulties arising in the attempted application of the acts as construed by the trial court.

For all the reasons we have heretofore mentioned we must conclude that to be exempt from the operation of the acts, tangible personal property purchased by a manufacturer and which enters into the processing of the manufactured product, must become a constituent part thereof, wholly or partially, by either chemical or mechanical means. The application of this rule will permit a certain and definite determination of tax liability, since the factual considerations involved need not proceed beyond the examination of the manufactured product. We are confident that this was the intent of the legislature in this connection. We also think it certain that the legislature in so concluding had in mind the distinction between the process itself and the intervening agencies used in applying the process to the finished product. While announced in a case arising under the patent law, this differentiation between "processing" and the means whereby it is effected, is clearly illustrated by the following quotation from *Johnson v. Foos Mfg. Co.,* 141 Fed. 73, 85, 72 C. C. A. 105 (quoting and adopting the definition promulgated in *Cochrane v. Deener,* 94 U. S. 780, 24 L. Ed. 139) : "A process is a mode of treatment of certain materials to produce a given result. It is an act or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable, whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order;

but the tools to be used in doing this may be of secondary consequence.''

The solicitude of the legislature to make clear that in ''processing,'' to be tax exempt tangible personal property must actually and factually enter into the subject matter transformed in the process, as in manufacturing proper it is required to become a constituent of the product, logically accounts for the circumstance that the two disjunctive clauses under examination were drawn to effect a substantially similar result and dispels any suggestion that the clauses are redundant.

Decisions of courts of other states construing their sales tax statutes are not particularly helpful because of the diversity of the language employed in the various laws, but the effect of the majority of these determinations seems to approximate the outcome arising from our interpretation of the Colorado act. In practically all of the states levying a sales tax, either the statutes themselves or administrative rules promulgated thereunder prescribe in substantial accord with our determination. The Supreme Court of Wyoming in the case of *State Board v. Oil Wells Supply Co.* (Wyo.), 65 P. (2d) 1093, involving a statute, containing in addition to clauses generally similar to the disjunctive clauses appearing in section 2 (n) of the Colorado act, the words, ''which [referring to tangible personal property] is actually used in the production of,'' held exempt from the Wyoming sales and use tax practically all articles purchased for use in producing and refining crude oil. This case, strongly relied upon by the company, is to be distinguished from the one before us by reason of the difference in the wording of the statutes and the patent extension of the exemption by the added words above quoted. Significantly, we think, it is to be noted that following this decision the Wyoming legislature amended their laws so as to specifically exempt only such articles as become a part of something produced. (§2 (f) c. 102, Wyoming Laws of 1937.)

The company contends that its mining oper-

ations as being a part of its manufacturing business, in effect is "manufacturing" within the purview of the acts, by reason of which under the interpretation placed upon section 2 (n) by the company, the machinery and equipment used in mining are claimed to be tax exempt under both acts. However, the trial court determined, and correctly we believe, that the mining operations of the company, even though the products thereof be devoted exclusively and necessarily to the manufacture of the final products offered for sale by the company, is not manufacturing within the meaning of the acts and upon this ground adjudged that the machinery and equipment purchased and used in the company's mining business are taxable under the acts. Of course, the same practical result as to the taxable status of the articles in this category is reached by our interpretation of secton 2 (n) supra. Even though the mining activities of the company principally conducted in conjunction with its manufacturing activities are probably not approximated in this respect by any other operation in Colorado and are of an entirely different character from the usual metalliferous mining and milling operations predominating in this state, amici curiae, on behalf of clients engaged in that field, have filed an exhaustive brief primarily designed to support their view that the mining operations of their clients are essentially a manufacturing or compounding business within the meaning of section 2 (n), supra, and entitled to the exemptions therein conferred upon the latter businesses. Secondarily, and upon generally similar argument, they endorse the company's construction of the statutes involved. These friends of the court concede that no evidence or factual matter whatsoever with reference to the type of mining, reduction or milling operations in which their clients are engaged or interested, appears in the record before us, but seek to justify their participation upon an apprehension that they might be adversely affected by some determination here.

Clearly, the state of the record limits our consideration

to the matters properly before us, and except as the conclusions herein announced may control, no other questions or issues are concluded.

 The company for many years has maintained a hospital at Pueblo primarily to serve its employees and members of their families and incidentally to furnish medical treatment and hospitalization, when · room is available, to other persons who are private patients of the physicians constituting the hospital medical and surgical staff. In addition to the hospital proper the company maintains a dispensary located at the steel plant at Pueblo at which one or more of the physicians are constantly in attendance to provide immediate medical attention to the employees of the plant. The company also provides medical attention for employees by local physicians at its various mining camps. The expenses of the operation of the medical department are paid by the company from a fund called the "hospital fund," which is derived from monthly fees paid by all of the employees of the company; by receipts from the hospitalization of the members of the employees' families, and general patients, and from the general funds of the company in case of a deficit, which, it is said, is perennial.

It is stipulated, in this connection, that the net contribution made by the company in addition to taxes, rent, interest and depreciation to the medical department for the period from 1929 to 1936, inclusive, was $52,248. Under the published rules of the company no earnings or profits may be drawn from the hospital fund by the company and the entire amount thereof is required to be used for the maintenance, treatment, care and benefit of the persons mentioned.

The employees of the company pay a fixed monthly charge, which entitles them to full and unlimited hospital services to the extent necessary to alleviate sickness, or injury. Except in a limited class of cases the system also provides for a greatly reduced rate, as compared with the customary charges of other hospitals, for services to the

members of the families of the employees. The members of the public, where admitted to the hospital, pay the usual prevailing charges.

The company claims that all supplies and equipment purchased and used in both the hospital and dispensaries are exempt by reason of the provision of section 6 of the sales tax act and the corresponding section of the use tax act, section 2 (e). Section 6, supra, provides, "* * * and all sales made to * * * charitable * * * corporations, in the conduct of the regular * * * charitable * * * functions and activities * * * shall be exempt from taxation under * * * this act."

Section 11 of the rules and regulations promulgated by the state treasurer and pertaining to the exemptions provided in section 6, supra, prescribes: "The general rule to follow in determining whether such an institution is charitable * * * is to ascertain whether or not it is exempt from the payment of general property taxes. If it is then that institution is exempt from the payment of sales tax on its purchases of tangible personal property."

If this rule contemplates the arbitrary determination of the liability of an institution for sales or use tax upon the basis of its *established* taxable status for ad valorem taxes it is erroneous. It may be, and likely is, the fact that any institution which has been exempted from liability for the general property tax likewise is entitled to exemption from the sales tax, but it does not necessarily follow that institutions which pay a general property tax may not be exempt from the sales tax by reason of their charitable operations. It is stipulated in this case that the company has always paid general property taxes on its hospital property. The company explains this situation by asserting that all of the property of the company has been assessed as a unit and because of the complications which would ensue from a change in this plan no particular effort has been made to exempt the hospital property from general taxation.

We have held in a number of cases, including *Board of*

*Commissioners v. D. & R. G. Ass'n,* 70 Colo. 592, 203 Pac. 850, and *Horton v. Colorado Springs Society,* 64 Colo. 529, 173 Pac. 61, that the right to exemption from general ad valorem taxes upon property assertedly used for charitable purposes depends upon the use made of the property rather than the charitable character of the owner. While the precise words of the sales tax act might seem to make the character of the owner of the property a factor in arriving at this conclusion, we believe the legislative intent was to exempt from the operation of the act purchases made in connection with charitable functions and activities regardless of the nature of the ordinary business of the person or corporation dispensing charity. Otherwise a person or corporation conducting a purely charitable operation collateral to his or its principal business would be required to pay the tax upon tangible personal property necessarily purchased in this beneficial work, which we cannot believe was the intention of the legislature. As has been mentioned, to the extent of the contributions made by the company to cover the hospital operating deficits the employees and their families are the recipients of a purely voluntary and charitable gift from the company.

If the hospital was self supporting, that is, if the fees paid by the employees and their families for hospital treatment, together with the receipts from private patients, equalled the costs of operation, it is obvious that it could not be classed as a charitable institution, but so long as the company does voluntarily make contributions a charitable use exists. In this lies one of the distinctions between this case and that of *Board of Com'rs v. D. & R. G. Ass'n, supra,* largely relied upon by the treasurer, as there the employees themselves and not the company maintained the hospital involved and the company made no contributions to its maintenance.

We also held in *Horton v. Colorado Springs Society, supra,* that the charitable purpose need not be public in order to secure the exemption from ad valorem taxation.

In many respects the facts of the case before us are analogous to those in *Bishop etc. v. Treasurer,* 37 Colo. 378, 86 Pac. 1021, in which it was held that the Oakes Home in Denver, operated for the treatment of tuberculars, was a charitable institution and as such exempt from general taxation under our constitutional and statutory provisions. In the Oakes Home case the facts disclosed that while the land and buildings had been donated as a charitable gift, the funds for the actual maintenance of the institution were derived almost entirely from charges paid by the patients of the home. Notwithstanding, the court reached the conclusion above indicated. In the case at bar, because of the admitted voluntary contributions made by the company, it would seem that the hospital under consideration equally, at least, if not more than the Oakes Home, should be considered a charitable activity.

In view of what has been said, we conclude that the necessary purchases and uses of tangible personal property made by the company for its medical department should be exempt from the sales and use tax.

In the stipulation relating to the facts submitted to the trial court, after the latter's preliminary construction of the statutes, the parties have briefly indicated the use made in the company's manufacturing operations of the many articles and commodities involved in this proceeding. Naturally, these statements relate the facts relevant to a determination of the status of items affected under the rule of construction adhered to by the trial court, but are not entirely pertinent or sufficiently detailed to cover the new situation created by the interpretation we accord the statutes. In view of this situation we cannot now prescribe the taxable status of each of these items of tangible personal property and must return the case to the trial court for determination of these questions upon the basis of the interpretation of the statutes herein announced. Accordingly, the judgment of the trial court is affirmed in part and reversed in part and the cause is remanded to

the district court for further proceedings not inconsistent herewith.

Mr. Justice Hilliard and Mr. Justice Bouck dissent in part and concur in part.

Mr. Justice Bakke not participating.

Mr. Justice Hilliard is of the opinion that the hospital of the company is not a charitable activity and purchases and uses of personal property therefor are taxable and upon this point dissents from the conclusion of the majority in which he otherwise concurs.

Mr. Justice Bouck concurs in the conclusion that purchases made by the company in connection with its hospital operations are tax exempt, but dissents in so far as the disposition here made otherwise reverses the judgment of the trial court.