No. 15,318.

Seal et al. *v.* State Board of Stock Inspection Commissioners for the use of Fred Klann and L. G. Weller.

(167 P. [2d] 22)

Decided March 4, 1946.

Mr. Robert H. Schaper, Messrs. January & Yegge, for plaintiffs in error.

Mr. Gail L. Ireland, Attorney General, Mr. H. Lawrence Hinkley, Deputy, Mr. James S. Henderson, Assistant, for defendant in error.

*En Banc.*

Mr. Justice Jackson delivered the opinion of the court.

In a trial to the court, the State Board of Stock Inspection Commissioners obtained judgment against C. A. Seal and his surety, the Western Casualty and Surety Company, in the amount of $287.30. The latter, bringing the cause here by writ of error, seek a reversal of the judgment.

Seal, as the operator of a livestock sales ring at Stratton, Colorado, duly licensed under chapter 258, 1937 Session Laws, and his surety, executed their bond to guarantee compliance with the terms of the act in the penal sum of $1,000. The salient provisions of the bond are as follows:

"Whereas, the principal is now engaged, or intends to be engaged in the business of operating a livestock sales ring, under the name or style of Stratton Sale Barn located at Stratton, State of Colorado, as provided in S.B. No. 65, of the Thirty-first General Assembly, approved April 8, 1937;

"Whereas, the purposes of this bond are to insure from and after the effective date thereof the payment of all moneys and the compliance by the principal of the conditions of said act relating to livestock sales rings and the rules and regulations of the State Board of Stock Inspection Commissioners made pursuant thereto. Now, Therefore, the conditions of this bond are such that if the principal —

"1. Shall pay or cause to be paid all money received by the principal, less reasonable expenses and agreed commission by the principal, to the rightful owner or owners of the livestock so consigned and delivered to the principal for sale, forthwith upon the sale of such livestock, or to the State Board of Stock Inspection Commissioners as in said act provided; and shall pay

forthwith to said State Board of Stock Inspection Commissioners all fees and inspection charges received by the principal;

"2. Shall keep or cause to be kept, such books and records in the manner and for the purposes specified by law, which shall be open to inspection by the proper officers as by law required; and

"3. Shall in all respects faithfully comply without fraud or evasion, with all requirements of the law and the regulations of the State Board of Stock Inspection Commissioners, then this obligation to be null and void, but otherwise to remain in full force, virtue and effect."

This bond was executed in compliance with section 4, chapter 258, S.L. '37, which reads as follows: "Bond. No license, or renewal of license, to establish and operate a livestock sales ring within the State of Colorado shall be issued until the applicant shall have executed to the State of Colorado, a bond in the penal sum of $1,000.00 *upon a form prescribed by said Board,* with surety to be approved by the State Board of Stock Inspection Commissioners, conditioned on the payment of all money received, less reasonable expenses and agreed commissions by the licensee and operator of such livestock sales ring, to the rightful owner or owners of the livestock so consigned and delivered to said licensee for sale, forthwith upon the sale of such livestock *and also a full compliance with all of the terms and requirements of this act,* and the acceptance and approval of said bond by the State Board of Stock Inspection Commissioners. When so approved, said bond shall be filed with the State Board of Stock Inspection Commissioners. Actions at law may be brought in the name of the State Board of Stock Inspection Commissioners upon any such bond, for the use and benefit of any person, firm or corporation who may suffer loss or damage from violations thereof. Copies of any such license and bond certified by the executive officer of said board may be procured upon payment of a fee of $1.00 each, and shall be re-

ceived as competent evidence in any court in the State of Colorado." (Italics ours)

Section 13, chapter 258, S.L. '37, contains the following provisions: "If, in the opinion of the examining veterinarian, said animals are free, and have not been exposed to any infectious or contagious diseases, he shall issue and sign a health certificate, to be delivered to the purchaser at the time of rendering the account of sale or bill of sale."

Section 6, chapter 258, S.L. '37, reads as follows: "Board Rules. The State Board of Stock Inspection Commissioners may adopt, publish and enforce rules and regulations necessary for the administration of this act."

Pursuant to authority of this latter section, the board adopted a regulation on May 7, 1937, which was abandoned on March 12, 1940, when a set of more specific regulations was adopted. The latter were in force at the time of the hog sales hereinafter mentioned. Sections 2 and 3 of the regulations deal with the duties of the veterinarian who should examine and test all livestock offered for sale. Section 4 provides that the examining veterinarian shall issue and sign a health certificate of prescribed form for each animal consigned to the sales ring that has passed the test, one copy of which "shall be delivered *by the licensee* of the livestock sales ring to the purchaser at the time of rendering the account of sale or bill of sale," a duplicate copy to go to the state board, State Office Building, Denver. Section 9, after providing that any violation of the regulation shall subject licensee to the cancellation, revocation or suspension of his license, also provides that, "Violations of this regulation shall also be deemed a penalty and subject the surety to a liability therefor under the penal provisions of the bond provided for in section 4, chapter 258, Session Laws of 1937."

The trial court found that the action was properly brought under chapter 258, supra, providing for the es-

tablishment and regulation of livestock sales rings. The facts of the case appear in the following findings of the court:

"2. * * * That by virtue of the conditions contained in the aforesaid bond, the defendant, C. A. Seal, before offering for sale through his livestock sales ring any hogs, was required to have such hogs inspected by an authorized veterinarian of the Colorado State Board of Stock Inspection Commissioners and to obtain a health certificate issued and signed by such veterinarian to be delivered to the purchaser at the time of rendering the account of the sale or bill of sale.

"3. That on February 12th, 1941, the defendant, C. A. Seal, sold through his livestock sales ring at Stratton, Colorado, thirteen head of hogs to one Fred Klann and further sold at the same time and place, six head of hogs to one L. G. Weller, all without first obtaining the health certificate required by law to be delivered to these purchasers; that the market value of the thirteen head of hogs sold to the said Fred Klann was Seventy and 10/100 Dollars ($70.10) and the market value of the hogs sold to L. G. Weller was Thirty-seven and 20/100 Dollars ($37.20).

"4. That the above referred to hogs were not vaccinated as required by the examining veterinarian before the issuance of the above referred to health certificate and that said hogs were at that time infected with cholera or contracted the infection of cholera by reason of which all of the said hogs died to the damage of the purchasers, Fred Klann and L. G. Weller; that in addition to the above loss, other hogs belonging to the said Fred Klann became infected with cholera by contact with the hogs purchased through said sales ring and the said Fred Klann suffered additional loss and damage by reason of the death of other hogs by cholera and by reason of the expense of a veterinarian and vaccination of the remainder of his herd in the amount of One Hundred Eighty and no/100 Dollars ($180.00); that the total

loss of the said Fred Klann was Two Hundred Fifty and 10/100 Dollars ($250.10) and the total loss of the said L. G. Weller was · Thirty-seven and 20/100 Dollars ($37.20), making the total damage suffered by these two purchasers by reason of the violation of law, the sum of Two Hundred eighty-seven and 30/100 Dollars ($287.30).

"5. That under the terms and conditions of the bond given by the defendants to the plaintiff, plaintiff is entitled to recover for the use and benefit of the said Fred Klann the sum of Two Hundred Fifty and 10/100 Dollars ($250.10) and is further entitled to recover for the use and benefit of the said L. G. Weller the sum of Thirty-seven and 20/100 Dollars ($37.20), together with costs of this suit."

In addition to the facts recited in the court's findings, it should be added that the bond involved herein was first executed on August 4, 1939, and was renewed each year thereafter in its original form, upon a simultaneous renewal of the license to Seal. Seal had been warned by Dr. Gow, the veterinarian of the state board, that he was violating the law in making sales without supplying the purchasers with health certificates and that he would get into trouble if he persisted in disregarding the law and regulations of the board. Counsel for Seal and his bondsman state that there is no dispute as to the material facts in the case.

Defendant Seal and his bondsmen contend that condition numbered 3 of the bond is not valid because in section 4, chapter 258, S.L. '37, which specified the form of bond, there was no provision for any compliance by the bondsman with the rules and regulations of the State Board of Stock Inspection Commissioners, and the board accordingly had no authority to require conditions in the bond not prescribed by the act. It is further argued that the original bond was issued prior to the promulgation of the rules and regulations of the board and therefore could apply only to the provisions of the

act itself, and not to the regulations of 1940. It also is asserted that even if the bond is valid, the rules and regulations of the board provide that the penal provisions thereof shall be those in the bond required by section 4, chapter 258, supra. It is therefore argued that there can be no recovery on the bond, whether it is treated as a statutory bond or as a common-law bond.

These arguments appear to be based upon the following false premise. It is stated unequivocally that chapter 218, S.L. '41, repealed chapter 258, S.L. '37, and embodied the same provisions in respect to the duties of the stock ring operator as those in the Stock Inspection Board regulations of 1940. Counsel then states: "When the legislature acted in 1941 upon the same matters covered by the regulation, it is clear that they then believed that the powers asserted by the State Board in adopting the regulation of March 12, 1940, were not delegated and authorized by the act of 1937 to the State Board, or, that the regulation did not cover the matters in respect to which the legislature then acted. In this act of 1941 there is a definite provision that the operator of the sales ring shall deliver a health certificate. Such is not included in the 1937 act." And again, in the reply brief, counsel contend that the legislature by the 1941 act made provision for a bond conditioned upon a compliance with the state board's rules and regulations, and then argue that this clearly manifests that such power was not granted to the state board by the 1937 act.

We are of the opinion that counsel's argument, as to the effect of the 1941 act, is erroneous, for the reason that an examination of that act shows that it did not repeal the act of 1937, but merely amended certain sections thereof, and the amendments do not appear to have the effect stated by counsel in their argument. All of the provisions of the 1937 act which we have set forth in this opinion were left unchanged by the 1941 act, except the amendments to which we hereinafter refer. If, therefore, there is any inference to be drawn as to

legislative approval or disapproval, it must be the inference that the legislature of 1941 approved the rules and regulations promulgated by the state board the year previous, on March 12, 1940. This becomes even more apparent when we consider the amended section 13, chapter 258, S.L. '37, providing for stock inspection by an authorized veterinarian, in which the 1941 legislature inserted the following italicized words: *"who shall execute and deliver to the said Board a bond with good and sufficient surety in the penal sum of $1,000 to be approved by such board, conditioned that he shall faithfully perform his duties as such authorized veterinarian, and such bond shall be upon a form prescribed by the said Board,* who shall examine and test each and every animal consigned to the livestock sales ring for the purpose of determining their condition of health and freedom from infectious or contagious diseases." The 1941 provision is thus exactly the same in respect to the duties of the veterinarian as that contained in the 1937 act, except for the additional duty of furnishing a bond. We are of the opinion that if the legislature had intended that it was the duty of the veterinarian to deliver to the purchaser the health certificate for each hog bought, it would have so provided. It will be noted that the health certificate is "to be delivered to the purchaser at the time of rendering the account of sale or bill of sale," and the rendering of the account of sale or bill of sale is not a duty of the veterinarian but of the licensee. In our opinion, therefore, the regulation of the board that the health certificate "shall be delivered by the licensee of the livestock sales ring to the purchaser at the time of rendering the account of sale or bill of sale," is merely a correct interpretation and declaratory of the provision in section 13 of the act. There have been three regular sessions of the legislature since the regulations of 1940 were promulgated by the state board. Although the legislature amended other sections of the 1937 act in 1941, it did not change the wording of section 13 of

the act, relating to the delivery of the health certificates, being content to accept the interpretation placed upon it by the board. We feel justified, also, in adopting this interpretation, not merely from a study of the grammatical construction, but also on the authority of *Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. 538, at p. 547, 81 P. (2d) 752, and the supporting cases cited therein. It would appear, therefore, that Seal violated the provisions of the 1937 act, as well as those of the 1940 regulations of the board. This conclusion is consistent with the findings of the trial court.

 It is argued that this is an action prosecuted for the use of two individuals, and that these two individuals, knew that the animals they were purchasing were not vaccinated against cholera and that they purposely bought them at a lower price; that they are estopped to claim damage because they both testified that they knew the hogs were below average in condition, but did not think they had cholera, and did not want hogs that were vaccinated; that they therefore participated in the act of which they are now complaining. The willingness of these purchasers to waive the provisions of the statute in their particular cases does not excuse the licensee for a violation of the law which he and the surety on his bond have bound themselves to observe. The same defense could be made for infractions of the liquor law where a willing customer might waive various provisions of the law in order to be served. The purpose of the legislature in enacting chapter 258, S.L. '37, would appear to be the prevention of the spread of infectious or contagious diseases of animals, including hogs, notwithstanding some customers might be willing to waive the law and buy some which were unvaccinated. It has placed the burden on the stock ring operator to see that there is a compliance with the provisions of the law. The same act, 1941, in which for the first time the legislature required the veterinarian to give a bond in the amount of $1,000 for the

faithful performance of his duties, also increased the amount of the bond of the stock ring operator from $1,000 to $2,500 to insure faithful performance on his part. We do not see in the 1941 act a shifting of duties from the stock ring operator to the veterinarian. A more rigid accountability is laid on each for the performance of his duties, which, with respect to the stock ring operator, are the same as those set out in the 1937 act.

The judgment is accordingly affirmed.