637 P.2d 324 (1981)
C. F. & I. STEEL CORPORATION, a Colorado Corporation, Plaintiff-Appellee and Cross-Appellant,
v.
Alan N. CHARNES, Executive Director of the Department of Revenue, State of Colorado, Defendant-Appellant and Cross-Appellee.
No. 79SA486.
Supreme Court of Colorado, En Banc.
October 26, 1981.
Rehearings Denied December 14, 1981.
*325 Welborn, Dufford, Cook & Brown, Thomas G. Brown, William C. Robb, Denver, for plaintiff-appellee and cross-appellant.
J. D. MacFarlane, Atty. Gen., Richard F. Hennessey, Deputy Atty. Gen., Mary J. Mullarkey, Sol. Gen., Chris J. Eliopulos, Sp. Asst. Atty. Gen., Denver, for defendant-appellant and cross-appellee.
HODGES, Chief Justice.
The Department of Revenue (Department) issued a notice of deficiency in the payment of use taxes on certain items used by C.F. & I. in the production of steel. C.F. *326 & I. filed an action in the district court seeking to invalidate the deficiency. The issues involved were tried to the court, which made extensive findings and entered judgment in favor of C.F. & I. The Department appealed the judgment to the court of appeals. Pursuant to C.A.R. 50, we granted certiorari before judgment and now affirm in part and reverse in part the judgment of the district court.
The issues on appeal concern the taxable status of certain items and material used by C.F. & I. in the production of steel. They are categorized as refractories, electrodes, molds, stools, cinder pots, and pig machine molds.
Refractories are materials used in the lining and construction of furnaces and other equipment used in the steel-making process, and come in a variety of types including brick, clay, plastic, and spray. The principal function of refractory material is to protect the furnaces and other vulnerable steel-making equipment from the intense heat generated in the steel-making process.
Refractory material is intended to be inert, thermally shock-resistant, and not penetrable by the molten metal or slag. Nevertheless, as found by the trial court and supported by the record, when it comes in direct contact with the molten metal, it is slowly consumed and a miniscule amount can be found present in the finished steel by chemical analysis. Other refractory materials which do not come in direct contact with the molten metal do not get into the steel, but deteriorate and must be periodically replaced.
One type of furnace used by C.F. & I. in the production of steel is the electric arc furnace (EAF). A charge, which is the material placed in the furnace to be melted and converted into steel, is generally composed of scrap iron. Graphite rods, called electrodes, are then lowered into the EAF and positioned immediately above the charge. The resulting electric arc generates a high degree of heat which melts the charge.
Carbon is a crucial element of finished steel, and is carefully controlled in each charge. There are occasions when the carbon content of the molten metal is found to be low and the production schedule requires immediate correction. When this occurs, the electrodes are dipped into the molten metal to increase its carbon content. It is estimated that one to three per cent of the electrode material enters into the finished steel.
Molds, stools, cinder pots, and pig machine molds are manufactured and used by C.F. & I. in the steel-making process. Molds are made of cast iron and are designed to hold molten steel while it cools. The useful life of a mold is between fifty and sixty pours. Stools are flat cast iron slabs which are the bottom portions of the molds. They have a useful life of between 120 and 140 pours. Cinder pots are receptacles used to transport slag. Approximately 15,000 tons of slag may be hauled during the useful life of a cinder pot. Pig machine molds are small troughs, rectangular in shape, that are used to contain pig iron during its solidification and transportation. Pig iron is iron ore after it has been melted down and reduced to a purer state by the addition of a flux to remove undesirable impurities. The useful life of pig machine molds is approximately forty to fifty pours.
C.F. & I. maintains its own foundry to manufacture these items. Raw materials are diverted from C.F. & I.'s normal steel-making process in order to manufacture these items. After their useful life, the equipment is scraped and melted down with other scrap iron used by C.F. & I. in the steel-making process.
On July 24, 1973, the Department commenced an income tax audit and a sales and use tax audit of C.F. & I. for the period commencing September 1, 1970. Department auditors were at C.F. & I.'s Pueblo, Colorado plant for approximately five days ending on September 20, 1973. The audit was thereafter postponed by the Department for several reasons, including an accommodation of C.F. & I.'s request for a delay pending the resolution of other unresolved taxation questions. Because of the audit's postponement, the Department requested *327 C.F. & I. to consent to a waiver of the running of the statute of limitations for the taxable period under examination, September 1, 1970 through August 31, 1973. A consent was executed by C.F. & I. on October 9, 1973. Subsequent to the execution of this consent, no further proceedings were noted in the Department's audit file from October 1973 to January 1975. On January 8, 1975, the Department commenced an income tax audit at the offices of C.F. & I.'s parent corporation, the Crane Corporation, and concluded the sales and use tax audit at the C.F. & I. home offices in Pueblo in February 1975. A notice of deficiency in the payment of use tax was issued to C.F. & I. on August 19, 1975 for the period from September 1, 1970 to March 31, 1975 on refractory material, electrodes, and molds, stools, cinder pots, pig machine molds, and on other items not in issue.
After exhausting procedures for administrative remedy, C.F. & I. commenced this action in the district court, which after trial, entered judgment based upon detailed findings of fact and conclusions of law. It held, inter alia: (1) a 1938 case between the same parties was res judicata as to the question of whether refractories were subject to the use tax (this holding is reversed); (2) electrodes used by C.F. & I. were exempt from the use tax under the processing clause of the sales and use tax law, section 39-26-203(1)(f), C.R.S.1973, which exempts tangible personal property which "enters into the processing of or becomes an ingredient or component part of the product ... manufactured...." (this holding is reversed); (3) molds, stools, cinder pots, and pig machine molds, which are manufactured by C.F. & I. for its own use, are not subject to the use tax because the items are not purchased at retail by C.F. & I. (this holding is affirmed); and (4) the statute of limitations commenced to run against C.F. & I.'s tax liability on October 9, 1974, one year after the consent to a waiver of the statute of limitations was executed by C.F. & I. (this holding is reversed). Both the Department and C.F. & I. appealed the judgment.

I. Taxability of Refractories

In 1937, C.F. & I., then known as the Colorado Fuel and Iron Corporation, commenced a declaratory judgment action in the Denver District Court. That case involved the same parties in the same capacity as does the present action. The fundamental question raised in the 1937 case concerned the taxability of various materials used by C.F. & I. in its steel manufacturing process, including the general category of refractories under the then newly enacted "Emergency Retail Sales Tax Act of 1935." (Now codified at section 39-26-101 et seq., C.R.S.1973). Specifically, the case concerned the interpretation and application of what is commonly known as the processing clause, now codified in section 39-26-203(1)(f), C.R.S.1973, which explicitly exempts from the provisions of the use tax that property which enters into the processing of or becomes an ingredient or component part of the manufactured product.
The trial court in the 1937 action entered a declaratory judgment setting forth a general interpretation of the processing clause. Both parties appealed and in Bedford v. Colorado Fuel and Iron Corporation, 102 Colo. 538, 81 P.2d 752 (1938), this court held that under the processing clause: "to be exempt from the operation of the acts, tangible personal property purchased by a manufacturer and which enters into the processing of the manufactured product must become a constituent part thereof, wholly or partially, by either chemical or mechanical means...." The judgment of the trial court was reversed, and the case was remanded with directions that specific findings be made as to the taxability of each of the articles involved in the case based upon the guidelines established in Bedford, supra.
On remand, the parties through respective counsel met on several occasions to attempt to stipulate regarding the taxable status of the articles in dispute. Ultimately, the parties entered into a stipulation and accordingly, prepared a proposed judgment order under the declaratory judgment act. After reviewing the proposed judgment order, *328 the trial court signed it and entered it as the judgment of the trial court on September 28, 1938. This judgment was not appealed by either party.
The first ten articles or classes of articles discussed in the 1938 trial court judgment covered all refractory material then used by C.F. & I. The parties' interpretation of the Bedford rule was stipulated, and the 1938 judgment reflected that refractories, as a class, were exempt from the payment of use tax because they fell within the provisions of the processing clause.
Initially, we must determine whether the doctrine of res judicata bars relitigation of the question of the taxable status of the refractory material used by C.F. & I. in its steel-making process.
The doctrine of res judicata has been adopted by this court on several previous occasions. See, e.g., Manka v. Martin, Colo., 614 P.2d 875 (1980); Brennan v. Grover, 158 Colo. 66, 404 P.2d 544 (1965); Green v. Chaffee Ditch Co., 150 Colo. 91, 371 P.2d 775 (1962); In re Craddock's Estate, 91 Colo. 79, 11 P.2d 807 (1932). The rule, simply stated, is that "an existing judgment is conclusive of the rights of the parties in any subsequent suit on the same claim.... It requires an identity of parties or their privies...." Pomeroy v. Waitkus, 183 Colo. 344, 517 P.2d 396, 399 (1973). The purpose of the rule is to put an end to litigation between the same parties concerning the same controversy by ensuring the finality of the previous decision. Brown v. Felsen, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). The doctrine of res judicata applies with equal force to a declaratory judgment order. San Luis Power & Water Co. v. Trujillo, 93 Colo. 385, 26 P.2d 537 (1933); Restatement of Judgments § 77 (1942). In this case, however, we find that res judicata does not bar relitigation of the question of the taxable status of the refractories used by C.F. & I. in its steel-making process.
This court interpreted the processing clause of the sales and use tax law in Bedford, and again in Western Electric Co., Inc. v. Weed, 185 Colo. 340, 524 P.2d 1369 (1974). The rule as enumerated by this court stated that in order to be exempt under the processing clause of the sales and use tax provisions of the statute, tangible personal property purchased by a manufacturer must become a constituent part of the finished product, wholly or partially, by either chemical or mechanical means. After the general rule was announced in Bedford, the case was remanded to the trial court. Because a small amount of refractory material used in the steel-making process could be found in the finished steel, the parties stipulated, and the trial court consequently held in 1938, that refractories as a class enter into the processing clause exemption. Neither party appealed, and we therefore did not have the opportunity to correct this misapplication of the rule announced in Bedford.
While it is true that small amounts of refractories are actually consumed in the steel-making process and that traces of those refractories can be found present in the finished steel, it is also true that refractories are not desirable components of the finished steel product. It is undisputed that refractories are manufactured and used by C.F. & I. with the intent that they not become a part of the finished steel product. The presence of refractories in the finished steel product is not essential to the composition of the steel. Rather, the presence of the refractories is tolerated as an inevitable consequence of the steel-making process. The amount of this impurity in the steel is miniscule.
The processing clause exemption, as explained by this court in Bedford and again in Western Electric Co., Inc., however, requires that in order to be exempt from taxation under this provision the tangible personal property must become a constituent part, that is, an essential component, of the finished product. While refractories might, and undoubtedly will, be found in trace amounts in the finished steel products, such refractory material is not an essential ingredient of the finished product.
*329 Because the trial court in the 1938 action misconceived the rule announced by this court in Bedford we conclude that res judicata does not apply to the current litigation concerning the taxable status of refractories. We are guided by Restatement of Judgments § 70 (1942):
"Where a question of law essential to the judgment is actually litigated and determined by a valid and final personal judgment, the determination is not conclusive between the parties ... if injustice would result."
An erroneous trial court judgment entered forty years ago which was not appealed, and consequently, not corrected, should not be the final mandate on the issue now before this court. See Restatement of Judgments § 70, comment f (1942). We hold that res judicata does not bar the current litigation concerning the taxability of refractories used by C.F. & I. during the taxable period here in question. See generally Henricksen v. Seward, 135 F.2d 986 (9th Cir. 1943); Ray Schools-Chicago, Inc. v. Cummins, 12 Ill.2d 376, 146 N.E.2d 42 (1957).
We therefore reverse the trial court's holding that res judicata bars litigation of this issue, and hold that refractories are not exempt from taxation under the processing clause of the sales and use tax laws.

II. Electrodes

Electrodes, as discussed above, are graphite rods used to carry an electric current into C.F. & I.'s EAF. The electrodes are lowered into the EAF to a position just above the charge. An electric arc is struck and the intense heat generated by the arc causes the charge to melt. From time to time, and as a matter of commercially accepted practice, the electrodes are dipped into the molten mass in order to increase a deficient carbon content in the molten steel. The electrodes are quite costly. Therefore, this dipping procedure is avoided unless required as an expeditious manner of correcting a minor carbon deficiency without delaying a production schedule.
The question presented is whether the electrodes, which are used in the steel-making process, are exempt from the use tax under section 39-26-203(1)(f) which is also referred to as the processing clause.
C.F. & I. is subject to payment of use tax on these electrodes pursuant to section 39-26-202, C.R.S.1973, unless the exemption set forth in section 39-26-203(1)(f), (the processing clause) is applicable. That exemption provides:

Exemptions. (1) This part 2 is declared to be supplementary to the "Emergency Retail Sales Tax Law of 1935," part 1 of this article, and shall not apply:
* * * * * *
(f) To the storage, use, or consumption of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished, and the container, label, or the furnished shipping case thereof; ....
In Bedford, we construed a substantially identical exemption provision as follows:
"... we must conclude that to be exempt from the operation of the acts, tangible personal property purchased by a manufacturer and which enters into the processing of the manufactured product, must become a constituent part thereof wholly or partially, by either chemical or mechanical means. The application of this rule will permit a certain and definite determination of tax liability, since the factual considerations involved need not proceed beyond the examination of the manufactured product."
102 Colo. at 549, 81 P.2d at 757. Accord Western Electric Co., Inc., supra.
While C.F. & I. does not dip the electrodes into every charge in the EAF, on occasion the electrodes are as a matter of commercial necessity dipped into the molten mass. The record indicates that this occurs *330 generally, once per day, or once every twelve to fifteen times the EAF is charged. When this occurs, carbon from the electrodes physically enters into the molten steel, but the amount is so small it may be said to be miniscule.
The electrodes are devices which are required to be installed in the steel-making machinery to generate intense heat. Only occasionally and as a matter of commercial necessity does a small portion of the carbon content of the electrodes enter into the molten steel. To exempt from the use tax all electrodes used by C.F. & I. because an extremely small amount of some of the material from some of the electrodes enters into the steel would in our view be extending the meaning of "wholly or partially" in the above quotation from Bedford far beyond the meaning intended by this court or contemplated by the statutory exemption in section 39-26-203(1)(f). We therefore hold that these electrodes are not exempt from the use tax.

III. Molds, Stools, Cinder Pots, and Pig Machine Molds

These are items used in the steel manufacturing process, and are manufactured by C.F. & I. at its own foundry from raw materials diverted from the steel-making process. After the useful life of these items, they are melted down and returned to the normal steel production process as scrap metal.
The Department argues that these items are used by C.F. & I. in its manufacturing process, and therefore the trial court erred in holding that they are exempt from imposition of the use tax. The Department also argues that, since materials to make these items are purchased at retail but exempt from the sales tax because of the processing clause exemption, therefore, C.F. & I. as the ultimate consumer ought to pay a use tax on these materials. We disagree.
In support of its first argument, the Department quotes section 39-26-202, C.R.S. 1973, which provides that a use tax is imposed upon "every person in this state ... for the privilege of storing, using, or consuming in this state any articles of tangible personal property purchased at retail." While asserting a deficiency in use taxes paid by C.F. & I., the Department ignores the statutory provision that the use tax is imposed upon tangible personal property purchased at retail. The Department argues that the appropriate taxable event is the moment of use or consumption.
The Department's argument misses its target. While the use of tangible personal property may constitute a taxable event, see section 39-26-202, C.R.S.1973, only that tangible personal property purchased at retail is subject to the use tax. Id. See also International Business Machines Corporation v. Charnes, Colo., 601 P.2d 622 (1979). Since C.F. & I. manufactures its own molds, stools, cinder pots, and pig machine molds, there has been no retail purchase. Consequently, the use tax is not applicable to these items. To hold otherwise would result in the imposition of a "value added tax" rather than the statutorily mandated use tax. International Business Machines Corporation v. Charnes, supra.
Regarding the Department's second argument that the diversion of the raw materials by C.F. & I. to its own temporary use and then back to the normal steel-making process constitutes a taxable event, we agree with the trial court's conclusion that this amounts to a "brief utilization" not constituting a taxable event. Initially, we note that the amount of materials diverted by C.F. & I. and purchased at retail must of necessity be speculative. Secondly, the diversion of such materials by C.F. & I. to its own use is temporary. Eventually the steel utilized by C.F. & I. for its own use in manufacturing molds, stools, etc., is returned to the steel production process as scrap iron. In effect, C.F. & I. has merely stored the materials for eventual use in the steel-making process and consequent consumption into the finished steel product. Multiple taxation is to be avoided. International Business Machines Corporation v. Charnes, supra.

*331 IV. Statute of LimitationsWaiver

The use tax assessment here in dispute involves a period of time commencing on September 1, 1970. The Department commenced an audit of C.F. & I. on July 24, 1973. On October 9, 1973, at the request of the Department, C.F. & I. executed a consent suspending the running of the statute of limitations with respect to any assessment of use tax for the taxable period September 1, 1970 through August 31, 1973.[1]
Following the October 9, 1973 execution by C.F. & I. of the consent form, essentially no action was taken by the Department with respect to the use tax audit until January 1975. On January 8, 1975, auditors were assigned to make a field audit of the C.F. & I. accounts. The audit of C.F. & I. with respect to its use tax liability was completed in February 1975, and a notice of deficiency was issued by the Department on August 19, 1975.
The trial court found that for the period between October 9, 1973 and January 8, 1975, the consent to waive the running of the statute of limitations executed by C.F. & I. was not effective because the tax was not "under examination, in dispute, or [on] appeal" as required by the terms of the consent form. See footnote 1, ante p. 14. However, because the consent form provided that the statute of limitations was not to run for a period of one year after any examination, dispute, or appeal of the taxes, the trial court concluded that the statute of limitations was effectively "tolled" for the period from October 9, 1973 to October 8, 1974. The trial court further ruled that on October 9, 1974, the statute of limitations again commenced to run with regard to all tax liabilities of C.F. & I. covered by the October 9, 1973 consent.
The Department argues that the trial court erred in ruling that C.F. & I.'s consumer use tax liability was not "under examination, in dispute, or [on] appeal" from October 9, 1973 to January 8, 1975. C.F. & I. cross-appeals arguing that the trial court erred in its ruling that the consent to waive the statute of limitations tolled the running of the statute at all.[2]
The statute of limitations affecting the consumer use tax is found in section 39-26-210, C.R.S.1973.[3] It states in pertinent part:
"The taxes for any period, together with the interest thereon and penalties with respect thereto ... shall not be assessed, nor shall any notice of lien be filed, or distraint warrant issued, or suit for collection be instituted, nor any other action to collect the same be commenced, more than three years after the date on which the tax was or is payable; nor shall any lien continue after such period, except for taxes assessed before the expiration of such period, notice of lien with respect to which has been filed prior to the expiration of such period, in which cases such lien shall continue only for one year after the filing of notice thereof.... Before the expiration of such period of limitation, *332 the taxpayer and the executive director of the department of revenue may agree in writing to an extension thereof, and the period so agreed on may be extended by subsequent agreements in writing."
The statute thus provides for a three-year limitations period, which period may be extended by a written agreement between the taxpayer and the Department.
In this case, C.F. & I. executed what is generally termed an unlimited waiver of the limitations period. It is unlimited insofar as the consent did not contain a definite expiration date. Such unlimited waivers are generally construed to extend either for a reasonable time or until the waiver is terminated by either party after reasonable notice. Helvering v. Ethel D. Co., 70 F.2d 761 (D.C.Cir.1934); Big Four Oil & Gas Co. v. Heiner, 57 F.2d 29 (3d Cir. 1932); Greylock Mills v. Commissioner of Internal Revenue, 31 F.2d 655 (2d Cir. 1929); United States v. Mortell, 248 F.Supp. 706 (N.D.Ill. 1965); see generally 10 Mertens, Law of Federal Income Taxation, § 57.48.
C.F. & I. executed the unlimited waiver on October 9, 1973. Thereafter, there is nothing in the record to indicate that C.F. & I. intended that the waiver should expire, or notified the Department of its intention that the waiver expire. Nor, in our view, is the period from October 9, 1973 until notice of use tax deficiency on August 19, 1975, a period of slightly more than twenty-two months, an unreasonable period for the waiver to be effective.
We reject the trial court's finding that from October 9, 1973 until January 8, 1975, the use tax liability of C.F. & I. was not under examination, in dispute, or on appeal. To the contrary, in our view, the use tax liability of C.F. & I. was in dispute from the time the Department notified C.F. & I. of its intention to conduct an audit concerning that tax until the notice of deficiency was issued by the Department. It is irrelevant that the Department did not make known its position regarding the taxability of certain items until sometime after the notice of intention to audit. The critical consideration is that the Department had determined to review the tax liability of C.F. & I., had given notice of that intention to C.F. & I., and that as a result of that review, an additional use tax assessment was made. The use tax liability of C.F. & I. was in dispute from the time the Department gave notice of its intent to audit C.F. & I. until the Department made some determination regarding that tax liability, either an assessment of additional liability or otherwise.
Our interpretation of the term "in dispute" is particularly appropriate in this case. Here, the Department notified C.F. & I. of its intention to conduct an audit regarding its tax liability. Thereafter, C.F. & I. requested in writing that the Department postpone its examination of C.F. & I.'s books and records for income tax purposes. The Department determined that it was important to conduct the income tax audit and the use tax audit at the same time. Consequently, the Department's acquiescence with C.F. & I.'s request to postpone the income tax audit led to the delay of the use tax audit.
For the reasons stated above, we hold that the October 9, 1973 consent form executed by C.F. & I. effectively suspended the running of the statute of limitations with respect to the use tax liability of C.F. & I. for the period of September 1, 1970 through August 31, 1973.[4]
The judgment of the district court is affirmed insofar as it holds that the molds, stools, cinder pots, and pig machine molds manufactured by C.F. & I. for its own use are not subject to the use tax. We reverse the judgment of the district court with respect to its ruling that res judicata bars the assessment of the use tax upon refractories used by C.F. & I. in the steel-making process and with respect to its holding that the electrodes are exempt from the use tax. We also reverse the judgment of the district *333 court concerning the effect of the October 9, 1973 waiver on the running of the statute of limitations. The cause is remanded to the district court for further proceedings consistent herewith.
DUBOFSKY, J., does not participate.
NOTES
[1] The consent form executed by C.F. & I. stated:

"In conformity with existing law and to avoid the necessity of an immediate jeopardy assessment of tax, penalty and interest within the period of limitations provided by statute, the undersigned and the Executive Director of the Department of Revenue of the State of Colorado hereby consent and agree to waive the running of the statute of limitations on assessment of tax, penalty and interest for the period during which the tax is under examination, in dispute, or appeal is pending and for one year thereafter."
[2] C.F. & I. argues on cross-appeal that the consent to waive the running of the statute of limitations was to become effective only if, following its execution, the use tax liability of C.F. & I. was subjected to examination, dispute or appeal. Because the trial court found that none of these conditions occurred C.F. & I. argues no part of the consent, and particularly the "one year thereafter" provision of the consent, ever came into force. Based on this, C.F. & I. asserts that the trial court erred in its ruling that the consent effectively tolled the limitations period from October 9, 1973 to October 8, 1974.
[3] But see Dye Construction Co. v. Dolan, 41 Colo.App. 293, 589 P.2d 497 (1978) (limitations period governed by section 39-21-107, C.R.S. 1973, in those cases involving use taxes where no return is filed).
[4] Having resolved the issue in this manner, we need not consider the other arguments raised by C.F. & I. on cross-appeal.