[No. 4774.]

THE BISHOP AND CHAPTER OF THE CATHEDRAL OF ST. JOHN THE EVANGELIST v. THE TREASURER OF THE CITY AND COUNTY OF DENVER.

1. **Taxes and Taxation—Property Used for Charitable Purposes —Evidence—Declarations of Employees.**

Evidence that the manager of an institution known as the "Home for Consumptives" had issued a prospectus concerning

the work and progress thereof, in which it was stated that the
Home was not a charitable institution, is inadmissible to deter-
mine whether or not the use of the buildings is, or is not, for
strictly charitable purposes; for the character of an institution
is to be determined by the purpose of its construction and the
manner of its operation, and not by the opinion of any indi-
vidual as to whether its work conforms to his notion of charity
or not.—P. 383.

2. **Taxes and Taxation—Exemptions—Property Used for Chari-
table Purposes.**

Land and buildings thereon donated to a corporation organ-
ized for charitable purposes, and used as a home for consump-
tives, are exempt from taxation under the constitution and stat-
utes of Colorado exempting real estate used for "strictly chari-
table purposes," notwithstanding that.payment is exacted from
patients for actual necessities furnished, according to their cir-
cumstances and the accommodations received, where such com-
pensation does not exceed the expenses, and the institution is
not maintained for gain or profit, and the sums paid or con-
tributed are devoted to the purpose for which the charity was
founded.—P. 386.

*Appeal from the District Court of the City and
County of Denver.*

*Hon. F. T. Johnson, Judge.*

Action by the Bishop and Chapter of the Cathe-
dral of St. John the Evangelist against the Treas-
urer of the City and County of Denver.   From a
judgment in favor of defendant, plaintiff appeals.
Reversed and remanded with directions to grant the
relief prayed for.   Decision *en banc.   Reversed.*

Messrs. Benedict & Phelps and Messrs. Rogers,
Shafroth & Gregg, for appellant.

Mr. Henry Lindsey and Mr. Charles R. Brock,
for appellee.

Mr. Justice Goddard delivered the opinion of
the court:

The appellant, plaintiff below, is an organiza-
tion duly incorporated under the laws of Colorado

for purposes other than pecuniary profit, viz: for religious, benevolent and charitable purposes. On the 22d day of June, A. D. 1895, John F. Spaulding conveyed to it, upon a nominal consideration, certain real estate situate in the city and county of Denver, Colorado, for the purpose of building, furnishing and maintaining thereon a building to be known as the "Home for Consumptives," to be held as a function of the plaintiff corporation, such corporation to have the general control touching the character and management thereof, with the due execution of the trust involved and, as incidental thereto, to receive and expend all funds given for the purpose of building and maintaining said establishment. The deed further provided that, in consideration of his being the originator of the plan for the establishment of the home, and of his efforts in raising funds sufficient to commence its building, his character and fitness for the raising of further funds for the superintendency and management of the institution, which he had announced to be his future life-work, the Reverend Frederick W. Oakes should be superin-. tendent thereof for life, or during his pleasure, subject to disability, removal from diocese, or failure to legally and faithfully execute the duties of the office. Through his instrumentality large sums of money were donated, and in course of time spacious, commodious and comfortable buildings arranged for the purpose were erected upon the land so conveyed to the corporation, and equipped and furnished as a home for people suffering with the disease commonly known as consumption.

The money used in the construction and furnishing of these buildings was donated by benevolent persons, largely residents and citizens of states other than the state of Colorado, and was furnished solely as an act of benevolence and charity, and as a gift

outright, without any hope of or wish for pecuniary profit or gain. Since the completion, and down to the present time, the buildings have been kept open and maintained as a home for consumptives, and very many persons suffering from such disease, and none other, have been received, kept and provided for therein.

Not having been endowed with funds for the maintenance or for any portion of the operating expenses thereof, it has been, and still is, necessary to maintain the home and carry on the trust, to charge the patients sufficient to cover the cost, as nearly as possible, of the actual running expenses of the institution—that is to say, the cost of food, light, help and supervision—and to this extent charges have been made, as to most of the patients, of weekly sums for the purpose of covering such expenses, but nothing has been charged, accepted or paid in excess of such actual expenses, nor has the amount so charged been equal, in any year, to such actual expenses. Nothing has been required or paid for the purpose of making a return by way of interest, rent, or otherwise, upon the money invested in the land and buildings, but funds to the amount of many thousands of dollars have been required outside of what has been paid by the patients to pay actual cost and expenses for the purposes aforesaid.

The Home was opened in the year 1895, and for the first year the expense of food, light, heat, etc., exceeded the receipts from guests by something over five thousand dollars. Every year since there has been even a larger deficit. These deficits have, from time to time, been made good by donations by various benevolent and charitably disposed people. The management has been economical, and the deficits are in no way chargeable to any extravagance or unreasonable conduct of the affairs of the Home. Mr.

Oakes, after testifying to receipts and disburse-
ments, states:

"As to the matter in regard to compensation to
be paid by guests, there are two questions we ask of
any one that comes to the Home. It is understood
that the rates at the Home are thus and so, and when
persons come to the Home, the persons must have
consumption, and must understand that, if they come
to the Home, they are to conduct themselves like a
lady or gentleman, and, if no questions are asked,
they are charged the usual rates   *   *   *   for the
Home proper—$25.00 to $45.00 a month—and it is
simply the charge that is made on what it will cost
to live in the Home. If any one has made a request
for a reduction, and that person has come with
proofs of their worthiness, I do not know of an
instance where what they have asked for has not
been met." And, after stating a certain instance,
continued: "I don't suppose there is ever a time or
a day since the institution has been opened that there
has not been some one there absolutely free, and not
only one person, but many, who are receiving help
to a degree.   *   *   *   Of course, the institution can-
not support itself. If there is nothing to help with,
there can be nothing given. But there has never
been a time when it has been denied; that is, having
the building, ground and furniture all up, it would
yet be impossible to take guests unless something
was paid by the guests to cover operating expenses,
or else it was made up by some one else. The insti-
tution was started without endowment fund, and that
is something that is looked to in the future. Every
one who is there, and who has made a request to me
which has been considered at all reasonable, has been
met, as regards compensation, whatever they have
asked. Private nurses have been furnished for peo-
ple who could not afford to pay them, and they have

lacked nothing in care. Everything has been given them, not only what they asked for, but what we found in our power to do. It has been a question of our seeking. We are not there for remuneration; we are there to serve. As to worthy people, consumptives, the fact that they haven't money has never debarred them from entering. If debarred, it is one of three reasons, viz: That I did not have the room, or that I did not have any means, or the person was shown not to be worthy."

Most of the persons received into the institution have been able to pay, and have paid, for what they received, upon a basis, however, not sufficient to cover the actual cost of food, heat, light and services. The appellee, defendant below, placed great stress upon the fact that Mr. Oakes had issued a prospectus concerning the work and progress of the institution, in which it was stated that the Home was not a charitable institution, and that he had, on other occasions, used expressions to the same effect. He explained that he used the term as meaning that the institution would not be conducted to provide for those wholly destitute of means, using the word "charity" as synonymous with pauperism. Plaintiff objected to this evidence, for the reason that the question as to whether the use of the buildings was, or was not, for strictly charitable purposes was not to be determined by declarations of employees, of whatever rank they might be.

We think the objection was well taken. The character of the institution is to be determined by the purpose of its construction and the manner of its operation, and not by the opinion of any individual as to whether its work conforms to his notion of charity or not.

What constitutes a charity, and what is a charitable purpose, have been defined by judges in many

cases. In *Harrington v. Pier*, 82 N. W. 345, the court
had under consideration the question whether a be-
quest for the promotion of temperance was a proper
subject for a charitable trust. After discussing the
law as to trusts in general, Marshall, Justice, says:
"A general statement of the essentials of a
charity, as regards the character of the work to be
performed, will substantially solve the question. It
includes everything that is within the letter and
spirit of the statute of Elizabeth, considering such
spirit to be broad enough to include whatever will
promote, in a legitimate way, the comfort, happiness
and improvement of an indefinite number of persons.
To that extent, such statute is generally held to be
a part of the common law of states even that reject
all the other features of it.    *    *    *    The general
scope of the statute, considering its letter and spirit,
as before indicated, has been judicially stated by
judges of great learning, whose statements have
come to be referred to generally in judicial opinions
as the true test rather than the statute itself. The
most familiar judicial statement of the law, as
recognized by the courts, is known as Gray's rule,
and is found in *Jackson v. Phillips*, 14 Allen 539,
where the bequest under consideration was for the
benefit of fugitive slaves, an object quite remote
from any specifically mentioned in the English stat-
ute. It was held, nevertheless, to be within the spirit
of the statute. After discussing various views of the
term 'charity,' as applied to charitable trusts, Jus-
tice Gray said: 'A charity, in the legal sense, may
be more fully defined as a gift to be applied consist-
ently with existing laws, for the benefit of an indefi-
nite number of persons, either by bringing their
minds or hearts under the influence of education or
religion, by relieving their bodies from disease, suf-
fering or constraint, by assisting them to establish

themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called charitable in the gift itself, if it is so described as to show that it is charitable in its nature.' Another definition often quoted was given by Mr. Binney in the Girard Will Case, 2 How. 127, 11 L. Ed. 205. It is as follows: 'Whatever is given for the love of God or for the love of your neighbor in the catholic and universal sense—given from these motives and to these ends—free from the stain or taint of every consideration that is personal, private or selfish.' Perhaps a more concise, comprehensive and practical definition is that found in *Missouri Historical Soc. v. Academy of Science,* 94 Mo. 459, 8 S. W. 346, as follows: 'Any gift, not inconsistent with existing laws, which is promotive of science or tends to the education, enlightenment, benefit or amelioration of the condition of mankind, or the diffusion of useful knowledge, or is for the public convenience, is a charity within the meaning of the authorities, whether so denominated in the instrument which evidences the gift or not.' Another rule, capable of being understood and applied by any person of ordinary understanding, was given by Lord Camden in *Jones v. Williams,* Amb. 652, and approved by the supreme court of the United States in *Perin v. Carey,* 24 How. 465, 16 L. Ed. 701, as follows: 'A gift to a general public use, which extends to the poor as well as the rich.' The theory of that is, that the immediate persons benefited may be of a particular class, and yet, if the use is public in the sense that it promotes the general welfare in some way, it has the essentials of a charity."

From the facts presented, it is too clear to require discussion that the land and buildings in question were donated and dedicated to a strictly char-

itable purpose. We do not understand that the appellee controverts this proposition, but seeks to justify the imposition of the tax by reason of the manner in which the institution is managed and the work conducted—in other words, that the fact that many, or all of the guests are required to pay for the light, food and services they receive, deprives it of the strictly charitable character contemplated in the following constitutional and statutory provisions in regard to exemptions. The language of the constitution is as follows:

"Lots with the buildings thereon, if said buildings are used solely and exclusively for religious worship, for schools or for strictly charitable purposes, also cemeteries not used or held for private or corporate profit, shall be exempt from taxation unless otherwise provided by law."

The statutory provision, so far as applicable to this case, reads as follows:

"Lots with the buildings thereon, if said buildings are used * * * for strictly charitable purposes, * * * shall be exempt from taxation."

It needs no argument, as above stated, to show that the property in question was donated and dedicated exclusively for a strictly charitable purpose, its object being to furnish a home for, and to minister to the comfort of those afflicted with a disease that excludes them from the ordinary resorts and places of entertainment. It is difficult to conceive of a more beneficial or helpful charity.

The only question, therefore, presented for our consideration is, whether the exaction of payment from the patients for the actual necessities furnished, according to their circumstances and the accommodations they receive, constituted a use of the buildings other than a strictly charitable one. We think that it has uniformly been held that, when such

compensation does not exceed what is required for the successful maintenance of the institution, it does not render it less a charity. Among the many cases so holding are the following: *Mich. Sanit. & Ben. Ass'n v. City of Battle Creek,* 101 N. W. 855; *Paterson, etc., v. High et al.,* 44 Atl. Rep. 974; *Phila. v. Penna. Hospital,* 154 Pa. St. 9; *Episcopal Academy v. Phila.,* 150 Pa. St. 565; *Downes v. Harper Hospital,* 101 Mich. 555; *County of Hennepin v. Brotherhood, etc.,* 27 Minn. 460; *Davis v. The C. C. M. Ass'n,* 57 Ohio St. 257; *State v. Powers,* 10 Mo. App. 263; *Trustees v. City of Louisville,* 100 Ky. 470; 5 Am. & Eng. Enc. of Law (2d ed.) 897, par. 3; *McDonald v. Mass. Gen. Hospital,* 120 Mass. 432; *Gooch v. Ass'n of Relief, etc.,* 109 Mass. 558; *Gerke v. Purcell,* 25 Ohio St. 229.

In *Michigan Sanitarium and Ben. Ass'n v. City of Battle Creek, supra,* the contention of defendant was, that the sanitarium was not a charitable institution because some of the persons were treated free, some at a reduced rate, but, apparently, most of them paid a regular schedule of prices fixed by the management. The total receipts were less than the total disbursements. Carpenter, Judge, speaking of defendant's contention, said:

"If we so hold, we declare that persons who dedicate a hospital to the public must pay taxes on that hospital, unless they maintain the same from their private means. The act contains nothing to warrant such a holding. It expressly exempts from taxation 'the property on which said asylum or said institution building stands   *   *   *   while occupied for the objects and purposes thereof'; that is, while occupied 'for the care or relief of indigent or other sick or infirm persons.' Such a corporation is sufficiently charitable to entitle it to the privileges of the act when the charges collected for services are

not more than are needed for its successful maintenance.''

In *Episcopal Academy v. Phila., supra,* Mr. Justice Williams, referring to the case of *Phila. v. Women's Christian Ass'n,* 125 Pa. 572, said:

''In that case it was said that the character of the association as a charity was not destroyed if, to some extent, it received a revenue from the recipients of its bounty. We are now disposed to go further, and say that an institution that is, in its nature and purposes, a purely public charity, does not lose its character as such under the tax laws if it receives a revenue from the recipients of its bounty sufficient to keep it in operation. It must not go beyond self-support.''

In *Gooch v. Ass'n, supra,* the association was incorporated for the relief of aged indigent females. The funds with which the institution was conducted were derived from voluntary donations, and it had no capital stock, or provision for making dividends or profits. It had erected a house for the purpose, and the board of managers and their appropriate committee were to determine who were fit subjects to receive this charity, what should be done to aid them, and on what terms and conditions and how long they should remain. The contention there was the same as here—that the association merely kept a boarding house. The court said:

''If this be so, it is still true that furnishing board, lodging and nursing to needy persons is among the most familiar and useful of charities, and that which constitutes such an institution a charity is, that it does not furnish these things for profit. The small amount of money and property required to be furnished by those who enter as inmates goes to supplement the charitable fund, and falls far short of being a compensation to the association for

what the inmate. receives.   Hospitals and schools generally require some payment of this kind, but are none the less charities on that account.''

In the later case of *McDonald v. Hospital, supra,* the court held that a corporation, the object of which is to provide a general hospital for sick and insane persons, having no capital stock; nor provisions for making dividends or profits, deriving its funds mainly from public and private charity, and holding them in trust with the object of maintaining the hospital, conducting its affairs for the purpose of ministering to the comfort of the sick, without expectation or right on the part of those immediately interested in the association to receive compensation for their own benefit, is a public, charitable institution.   It was further held that the fact that the corporation, by its rules, required of its patients payment for their board according to their circumstances and the accommodations they received, no person having individually a right to demand admission, and the trustees of the hopsital determining who were to be received, did not render it the less a public charity.

''When the charity is public the exclusion of all idea of private gain or profit is equivalent in effect to the force of 'purely' as applied to public charity in the constitution.''—*Gerke v. Purcell, supra.*

Counsel for appellee claim that the testimony discloses that no person is received in this Home without some compensation, and this fact distinguishes the case at bar from those above cited.   We do not think that the right to exemption is affected by the fact that few pay, or all pay, so the amount received does not exceed the expenses, and the institution is not maintained for gain or profit, and the sums paid or contributed are devoted to the purpose for which the charity was founded.

It is disclosed by the testimony of the assessor that other hospitals in the city are exempted from taxation, notwithstanding they all but one charge those who are able to pay sufficient to cover nursing, medical attendance and food, and that the Home is practically the only eleemosynary institution in Denver which he has assessed.

We do not think that the fact that other hospitals, as stated by the witness, have received county patients justifies this discrimination, and are of the opinion that in the circumstances of this case the Home is equally entitled to exemption, and that the tax sought to be enforced is unauthorized.

The judgment of the court below is reversed, and the cause remanded with directions that the relief prayed for be granted.

Decision *en banc.*                    *Reversed.*