No. 22901.

THE UNITED PRESBYTERIAN ASSOCIATION, A NON-PROFIT COLORADO CORPORATION; HOWARD A. LATTING, A. A. HALL, AND RAYMOND E. CARPER, CONSTITUTING THE COLORADO TAX COMMISSION; AND COLORADO TAX COMMISSION *v.* THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF JEFFERSON, STATE OF COLORADO.

(448 P.2d 967)

Decided December 23, 1968. Rehearing denied January 27, 1969.

486

488

Donald D. Cawelti, Kelly O'Neall, Jr., for plaintiff in error The United Presbyterian Association.

Duke W. Dunbar, Attorney General, Frank E. Hickey, Deputy, John E. Bush, Assistant, for plaintiff in error Colorado Tax Commission.

Joseph E. Maker, J. Frederick Schneider, Ronald Lee Cooke, for defendant in error.

*En Banc.*

Mr. Justice Hodges delivered the opinion of the Court.

Defendant in error, Board of County Commissioners for Jefferson County, brought an action in district court against plaintiffs in error, the United Presbyterian Association and the Colorado Tax Commission to remove the tax exempt status for the years 1964, 1965 and 1966 of Highland West, a senior citizens' residential home owned by the Association. The trial court, after a stipulated trial de novo, vacated the Tax Commission's ex parte order granting exemption from ad valorem taxes for these three years, and the court ordered the Association's property, Highland West, restored to the assessor's rolls and taxes to be duly collected thereon.

Supersedeas is in effect while the Association and Tax Commission prosecute this writ of error.

The sole question presented for review is whether or not Highland West, owned and operated by the nonprofit Association, as a home for physically independent elderly persons who pay for their tenancy, is entitled to tax exemption. Plaintiffs in error claim that the property is tax exempt, because it is owned and used for a charitable purpose within the purview of applicable Colorado law. The defendant in error asserts the contrary. The tax status of a senior citizens' home of the kind typified by Highland West, is a question of first impression in this court. Counsel for all parties have submitted able briefs, with extensive argument and review of authority, and in the course of this opinion, we shall treat all significant contentions therein raised.

Plaintiff in error, The United Presbyterian Association, was incorporated as a Colorado nonprofit corporation in 1961. Its formation was sponsored by three Denver area churches, each of which designated three trustees to constitute the Board of the Association. The Association's articles of incorporation declare the following corporate purpose:

"To provide elderly persons on a nonprofit basis, with housing facilities and services, specially designed to meet the physical, social and psychological needs of the aged, and contribute to their health, security, happiness and usefulness in longer living."

Its bylaws provide for the disposition of the Association's assets upon dissolution, and prescribe that the remaining net assets shall be set over to the three sponsoring churches to be used, as they may direct, in furtherance of "the charitable, educational and benevolent purposes of this corporation."

The Association built Highland West, a 12-story apartment house containing 121 units, ranging in size from buffet apartments to two-bedroom apartments. The building has special construction features designed for

the elderly: ramps in lieu of steps, wide doors to accommodate wheelchairs, grab bars at strategic locations, an electronic alarm system connecting each apartment with the resident manager's office, and elevators of a size to admit stretchers. The building also has a lounge, recreation room, and enclosed roof deck for common use by the tenants, as well as two kitchens for group use. The total cost of Highland West was $1,552,354.11, of which $176,712.32 is attributable to land acquisition cost.

The building was financed by funds derived from a loan in the sum of $1,554,790 obtained from a private mortgage company, and insured by the Federal Housing Administration under Section 231 of the National Housing Act. The Federal Housing Administration required the three sponsoring churches to advance $90,000 to the Association, which was done in the following manner: $45,000 loan from the Denver Presbytery, secured by a conveyance of Association property worth $20,000, subject to repurchase; and, $30,000 and $15,000 loans from the other two churches respectively. All loans are noninterest bearing. In addition, the Federal Housing Administration required establishment of a $32,000 trust fund, and the money therefor came from tenants' occupancy fees.

The home is operated by the Association. The trustees receive no compensation, but a realty firm is employed to manage the property. A resident manager and an assistant manager are also employed.

Persons desiring to reside in Highland West are required to submit a written application, together with a $100 application fee, to the Admissions Committee of the Association. The application must contain information as to the personal history, financial status, and health of the applicant. The Admissions Committee screens all applicants, pursuant to standards prescribed in the Association's bylaws, and admission to residence is contingent upon the Committee's approval.

Although partially handicapped persons will be admitted, they must be fully self-sustaining physically, because Highland West is not a nursing home. The physical requirement for residency was stated thus by one of the Association's witnesses:

"If this individual is coming from a place where a daughter is taking care of them and the daughter can no longer carry the burden, then Highland West is not the place for them, they have gone beyond Highland West; because Highland West is designed for people that are physically independent, they are up and going, they are participating in activities."

Upon being accepted, the prospective tenant must sign a written form agreement which obligates him to pay an occupancy fee and a monthly rental. The occupancy fee is fixed at an amount ten times the monthly rental. The monthly rentals vary from $62 to $155. There are 30 different monthly rentals within this range and the average monthly rental exceeds $100. The occupancy fee, being ten times the monthly rental, will vary from $620 to $1,550. Both the occupancy fee and the monthly rentals are based on the kind of accommodation provided, thereby corresponding to the rate structure used by commercial multiple dwellings. In addition, the tenants pay a small sum for use of the washers and dryers; they are subject to special charges for extra services of nursing, preparation of meals, and cleaning during temporary illness; and, if they change from one apartment to another, they must pay a $25 charge to cover the "administrative costs" of moving. According to the Agreement, the monthly rentals may be increased at any time. It is also to be noted that the Agreement provides that in the event Highland West is found not to be exempt from ad valorem taxes, the monthly rentals will thereupon be increased to provide an amount sufficient to pay such taxes.

Upon termination of the Agreement, the occupancy fee, less cost of redecorating the unit, is not refundable

until 30 days after the apartment is relet and a new occupancy fee is received. The Association's balance sheet, which shows the full sum of occupancy fees as a liability, should be read in light of this provision in the Agreement, because refund of any occupancy fee is always offset by receipt of a new fee, with a 30-day delay in the Association's favor.

There is nothing in the Association's articles of incorporation, bylaws, or in its Agreement with the tenant, which imposes any obligation upon the Association with respect to a resident who loses either his financial or physical independence.

Although the bylaws authorize discretionary disbursements from a charity fund to needy residents, there is no duty to provide any financial assistance to them. The Association's Board of Trustees has designated the interest from the $32,000 trust fund to be placed in a separate charity fund, but this designation is subject to change. The trustee's fees for maintaining the trust fund are deducted before the interest is set over to the charity fund, so that a proportionate part of the trustee's fees are deducted from the interest allocated to charity.

As of the time of hearing, the total amount which had accrued in the charity fund was $1,000.92, from which only $96 had been expended for "rent adjustments" due to financial need. Of the 121 units in Highland West, only two have been reserved for charitable use. These two units were vacant at the time of the hearing, and there is no evidence to show that they have ever been occupied. Total donations of cash and furnishings to Highland West do not exceed $3,000. All else is either charges to residents or loans.

To determine whether or not Highland West is exempt from ad valorem taxation requires consideration of Art. X, § 5 of the Colorado constitution, which reads in pertinent part:

"Property, real and personal, that is used solely and exclusively ... for strictly charitable purposes ..., shall

be exempt from taxation, unless otherwise provided by law."

From 1876 to 1967, the legislature has not "otherwise provided by law," but has retained the statute pertaining to tax exemption in substantially the same words as the constitutional provision. *McGlone v. First Baptist Church of Denver*, 97 Colo. 427, 50 P.2d 547. However, in 1964 the exemption statute was amended to impose the dual requirement that the property be *"owned* and used" for strictly charitable purposes. 1965 Perm. Supp., C.R.S. 1963, 137-2-1(8). But the constitution requires only "use," and use, rather than ownership, is the well-established test of exemption from taxation. *Spears' Clinic v. Wilson*, 103 Colo. 182, 84 P.2d 66; *Board of County Commissioners v. San Luis Valley Masonic Ass'n*, 80 Colo. 183, 250 P. 147; *Board of County Commissioners v. Colorado Seminary*, 12 Colo. 497, 21 P. 490.

 The court is not unmindful of the 1967 amendment to the charitable exemption statute, which imposes a special and gradually increasing assessment rate upon residential properties owned and used solely and exclusively for strictly charitable purposes and which are not an integral part of a church or an eleemosynary hospital, school or institution, whose property is statutorily exempt under the statute. 1967 Perm. Supp., C.R.S. 1963, 137-2-1. However, this amendment not only is inapplicable to the years involved here, but has no application to this property. The 1967 amendment was simply an exercise of the power, which Art. X. § 5 of our constitution grants to the legislature, to remove the tax exemption of certain properties used for strictly charitable purposes. But the constitution does not authorize the legislature to define what shall constitute a charitable purpose. The power to construe the constitutional meaning of "charitable purposes" is vested solely in the judiciary. In *People v. Martin*, 19 Colo. 565, 36 P.543, 24 L.R.A. 201, the court declares that Mr.

Justice Cooley "clearly states the American doctrine . . .," vide:

" 'But the judiciary is the final authority in the construction of the constitution and the laws, and its construction should be received and followed by the other departments.' " Cooley's Principles of Constitutional Law, p. 139.

 The court is also aware of the record's disclosure that the Colorado Tax Commission has granted tax exempt rulings to 26 senior citizen homes, similar or comparable to Highland West, during the years 1963 to 1966 inclusive. We further note that the legislature has re-enacted the tax exemption statute twice during the period 1963-1966 without any amendment modifying the effect of these rulings. Plaintiffs in error contend that these legislative re-enactments, without pertinent change, amounted to legislative confirmation of the Commission's tax exempt rulings with respect to these 26 senior citizen homes. Although this contention may be deemed valid in certain instances, it cannot serve to abridge the judicial function in this case. Judicial legislation must be carefully avoided, but legislative supersession or administrative usurpation of the judicial prerogative is equally to be eschewed.

█ This court has decided a number of cases involving the interpretation of "charitable purposes" in the context of Art. X, § 5 of the constitution. The definition which we have most frequently quoted is that of Mr. Justice Gray in *Jackson v. Phillips*, 96 Mass. (14 Allen) 539:

"A charity, in the legal sense, may be more fully defined as a *gift*, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint, by assisting them to establish themselves in life, or by erecting or main-

taining public buildings or works *or otherwise lessening the burdens of government.*" (Emphasis added.)

[For other cases in which this definition is quoted with approval, see *Board of County Commissioners v. San Luis Valley Masonic Ass'n,* 80 Colo. 183, 250 P.147; *Bishop and Chapter v. Treasurer,* 37 Colo. 378, 86 P. 1021; *Clayton v. Hallett,* 30 Colo. 231, 70 P.429, 59 L.R.A. 407, 97 Am. St. Rep. 117.]

We shall not attempt in this opinion to enunciate a fixed definition of the phrase "strictly charitable purposes," "lest by words of exclusion we might unintentionally seem to impose a legal restraint upon that cardinal grace which by its very nature thrives in proportion to the freedom of its proper exercise." *Gregory v. Colorado National Bank,* 91 Colo. 172, 13 P.2d 273. In lieu of formal definition, the cause of charity will be better subserved by considering all of the facts and circumstances in each given case to determine whether or not property is exempt from taxation because used for "strictly charitable purposes." *Bishop and Chapter v. Treasurer,* 29 Colo. 143, 68 P.272.

The history of the adoption of § 5 of Article X of our constitution evinces the determined intent of the framers that the tax exemption of property used for eleemosynary purposes should not be an unlimited privilege. The *Proceedings* of the Constitutional Convention, Colorado, 1875-1876, disclose the following:

(1) Four separate drafts of Section 5 were proposed; numerous amendments were made to each; a half-dozen citizens' petitions were submitted representing opposing views of exemption; the provision was tabled and reconsidered several times; and, some 16 votes were taken both on the main question of tax exemption and parliamentary motions with respect thereto.

(2) The tenor of Section 5 remained constant throughout its various drafts:

First, the stated purpose was always restricted to either "purely" or "strictly" charitable;

Second, the effort to delimit "charitable purposes" was continuous, as shown by the rejection of the proposal submitted by the Committee on Revenue and Finance and by the adoption of the Committee of the Whole Convention's proposal that the exemption be restricted to land not to exceed 150 square feet; and, by the later amendment limiting the exemption to buildings and land "sufficient in extent for necessary and convenient use;" and,

Third, the legislature was consistently empowered to remove entirely the charitable exemption.

 Turning to the judicial construction of Art. X, § 5, we find the firmly established rule is that the presumption is against tax exemption, and the burden is on the one claiming the exemption to establish clearly his right thereto. *Colorado v. Estate of Fisch,* 153 Colo. 525, 387 P.2d 282; *Bedford v. Hartman Brothers,* 104 Colo. 190, 89 P.2d 584; *Murray v. Montrose County,* 28 Colo. 427, 65 P.26; *Board of County Commissioners v. Colorado Seminary,* 12 Colo. 497, 21 P.490. The rationale underlying the strict construction of exemptions from taxation is stated by the court in the *Colorado Seminary* case, *supra,* which quotes with approval the following excerpt from an early United States Supreme Court opinion:

" 'The taxing power is vital to the functions of government. It helps to sustain the social compact, and to give it efficacy. It is intended to promote the general welfare. It reaches the interests of every member of the community. It may be restrained by contract in special cases for the public good where such contracts are not forbidden, but the contract must be shown to exist. There is no presumption in its favor. Every reasonable doubt should be resolved against it. Where it exists it is to be rigidly scrutinized, and never permitted to extend, either in scope or duration, beyond what the terms of the concession clearly imply. It is in derogation of public

right, and is only a trust created for the good of all.' *Tucker v. Ferguson,* 22 Wall. 527."

However, once the right to tax exemption has been clearly established, then this court has approved great latitude of method in effecting the charitable result. See *e.g., Horton v. Colorado Springs Masonic Building Society,* 64 Colo. 529, 173 P.61, where proceeds from renting lodge rooms and operating concessions were entirely devoted to relief of the needy; *Board of County Commissioners v. San Luis Valley Masonic Ass'n,* 80 Colo. 183, 250 P.147, where leasehold sale proceeds were used exclusively for the needy; and, *Kemp v. Pillar of Fire,* 94 Colo. 41, 27 P.2d 1036, where the proceeds from use of agricultural land were used exclusively for supporting and maintaining a college in which the great majority of students were without financial resources and were permitted to attend free.

Defendant in error has asked this court to "clarify the conflict" in our prior decisions as to whether or not statutes granting charitable exemptions should be strictly construed. We disagree with the premise that such a conflict exists. Our prior decisions have consistently adhered to the principle that charitable purpose as an end will be strictly construed; but if the end be clearly established as charitable, then the means used to achieve that end will be liberally construed as a use for a charitable purpose.

In ascertaining whether Highland West is used for a charitable purpose, we deem certain facts to be significant: Candidates for admission to residence must fulfill prescribed standards of physical independence and financial status. They must pay a nonrefundable application fee of $100. A mandatory occupancy fee of ten times the monthly rental is payable prior to admission to residence, and this fee is refundable only upon receipt of the occupancy fee from a successor tenant. The monthly rentals vary according to the kind of accommodation provided. And the monthly rentals, which

range from $62 to $155 for buffet and two-bedroom apartments, are competitive with commercial apartment houses. Special additional charges are made for use of laundry facilities, apartment cleaning, and for care during temporary illness. The rental schedules are fixed in an amount necessary to pay interest and amortize principal on the mortgage debt and to maintain the property, and are subject to revision for these purposes. The Agreement which the tenant is required to enter into with plaintiff in error Association provides that if Highland West is found not to be tax exempt, the monthly rentals will be increased in an amount sufficient to pay the ad valorem tax.

Plaintiffs in error have sought to establish the special facilities and services provided by Highland West as constituting the "charitable purpose" which will support tax exemption. A careful review of the record discloses that these special facilities and services differ only in type, but not in nature, from those provided by commercial multi-residential buildings. Thus, Highland West has ramps, safety rails, card recreation rooms and shuffleboard. These are facilities of the same nature as small golf courses, swimming pools, sauna baths, gyms, and tennis courts provided by some commercial apartment houses for tenants who find these facilities compatible with their needs and enjoyment. The recreational services at Highland West, such as potluck suppers and scheduled card games, do not differ inherently from the planned social activities at a commercial resort. As to health and welfare services, all that was indicated in the record is that information is provided to the residents with respect to use of oxygen, medicare benefits, and precautions to be used in case of fire. Assisting the elderly residents to attend church services should be a spontaneous kindness proffered without regard to physical independence or financial status. In summary, the aggregate of the facilities and services provided by Highland West, as revealed by the record, does not sug-

gest "charity" within the ordinary connotation of that term.

■ We find that the Colorado Tax Commission erred in considering as a factor favoring tax exemption the fact that Highland West qualified as a project under Section 231 of the National Housing Act. Section 221, National Housing Act (also cited as Sec. 1701(q), 12 U.S.C.A.) is a direct loan program to provide elderly persons, including those who are physically handicapped and who have low or moderate income, with housing at substantially lower rents than available in ordinary commercial housing, because the loan carries a lower than market interest rate. 1964 U.S. Code Cong. and Adm. News, p. 3425, House Report No. 1703. *But Section 231,* National Housing Act, (also cited as Sec. 1715(v), 12 U.S.C.A.), which is applicable here, merely provides a mortgage insurance program for housing of the elderly. 1959 U.S. Code Cong. and Adm. News, p. 2860, Senate Report No. 924. The stated statutory purpose of Section 231 is "to increase the supply of rental housing for elderly persons..." — and only 50% of the housing so insured need be occupied by the elderly. No mention is made in Section 231 of rentals being less than those ordinarily charged by commercial housing facilities. The mortgage insurance provided by Section 231 is available to both profit and nonprofit enterprises, with the only distinction being insurance of 90% of replacement cost for the former and 100% for the latter. The provisions of Section 231 neither directly nor impliedly connote "charitable" as a purpose of the housing thus insured.

■ Concededly, the plaintiff in error, United Presbyterian Association, is a nonprofit corporation and operates Highland West on a nonprofit basis. But nonprofit status cannot be equated with charitableness. Rather, it is but one factor which merits consideration in the determination of whether property is being used for strictly charitable purposes. Not only did the plaintiffs in error fail to establish a basis for a tax exempt

status, but in our view, the following are some of the factors which weigh rather significantly against a charitable tax exemption:

First: The amount and nature of the fees and rentals which plaintiff in error, United Presbyterian Association, requires the elderly tenants to pay negate a "charitable purpose." Although charging rentals does not ipso facto deny a charitable purpose, *Bishop and Chapter v. Treasurer*, 37 Colo. 378, 86 P.1021, the facts in this case bring it squarely within the conclusion reached by the court in *Methodist Old Peoples Home v. Korzen*, 233 N.E.2d 537 at 542 (Ill.):

"While charging fees would not necessarily remove plaintiff from the category of a charitable institution . . ., the fact that it allocates living space from the standpoint of desirability of location and size on the basis of the amount of the Founder's Fee [cf. "occupancy fee" in the case at bar] and monthly charges paid by a resident seems to us lacking in the warmth and spontaneity indicative of charitable impulse. Rather, it seems more related to the bargaining of the market place."

Second: Nothing in the articles of incorporation or bylaws of the United Presbyterian Association, or in the Agreement which it enters into with tenants, imposes any obligation upon the Association to care for persons if they become ill or without financial resources.

Third: The total cost of Highland West was over one and a half million dollars. One year's monthly rental income was shown to be $124,312.67; and, during that year, a total of $96 was donated by the Association as "rent adjustments." These, together with the other factors involved here refute the contention that the subject property is used "solely and exclusively" for "strictly charitable purposes," within any reasonable intendment of our constitution and statute.

Lastly, but far from the least significant factor in determining whether or not the property is being used for a charitable purpose, is this: Is Highland West per-

forming what would otherwise be a governmental function? The justification for charitable tax exemption, especially insofar as the rights of the body politic are involved, is that if the charitable work were not being done by a private party, it would have to be undertaken at public expense. *Kemp v. Pillar of Fire*, 94 Colo. 41, 27 P.2d 1036. This is the controlling difference between the case at bar and *Bishop and Chapter v. Treasurer, supra,* upon which plaintiffs in error strongly rely. In the *Bishop* case, a church-owned "Home for Consumptives," with paying residents but operated on a non-profit basis, was held to be tax-exempt. But the residents were physically afflicted persons, whose disease then required their isolation from the community. If the church had not provided a special residential facility, the government would have had the obligation to do so.

Although care for the aged is a proper concern of government, governmental obligation does not extend to the care of physically and financially independent elderly persons who alone can qualify for admission to Highland West. "The furnishing of homes to older adults is not in itself a charitable purpose." *Hilltop Village, Inc. v. Kerrville Ind., School Dist.,* 410 S.W.2d 824, aff'd, 426 S.W.2d 943 (Tex.). And the fact that Colorado has construed "charitable" as used in our Constitution and pertinent statutes to include both public and private charity, does not alter the basic standard: There must be present benefit to the general public which is sufficient to justify the loss of tax revenue. *Application for Exemption of Real Property from Taxation by Lutheran Senior City,* 9 Ohio St. 2d 151, 224 N.E.2d 352.

The question as to whether or not tax exempt status should be granted to senior citizens' homes, substantially comparable to the operation here considered, has been decided by courts in a number of other states. Some of the more recent cases holding such homes to be tax exempt, because used for a "charitable purpose," are *In re Tax Appeals of United Presbyterian Homes,*

428 Pa. 145, 236 A.2d 776, *Bozeman and Deaconess Foundation v. Ford,* 439 P.2d 915 (Mont.), *Fredericka Home for the Aged v. San Diego County,* 35 Cal. 2d 789, 221 P.2d 68. Holding such homes are not tax exempt, because not used for a "charitable purpose" within the context of constitutional and statutory tax exemption provisions, are the following recent cases: *People v. Ass'n of Winnebago Home for Aged,* 237 N.E.2d 533, (Ill.), *Methodist Old Peoples Home v. Korzen,* 233 N.E.2d 537 (Ill.), *Crestview of Ohio, Inc. v. Donahue,* 14 Ohio St. 2d 121, 236 N.E.2d 668, *Application for Exemption of Real Property from Taxation by Lutheran Senior City, Inc.,* 9 Ohio St. 2d 151, 224 N.E.2d 352, *Hilltop Village, Inc. v. Kerrville Ind. Sch. Dist.,* 410 S.W.2d 824 (Tex., Civ. App., *aff'd,* 426 S.W.2d 943 (Tex., Sup. Ct.), *Mountain View Homes, Inc. v. State Tax Commission,* 77 N.M. 649, 427 P.2d 13. But a mere tally of authorities cannot be persuasive as to the disposition of this case. Each claim for tax exemption must be determined upon the facts presented and in light of our constitutional and statutory provisions.

The church organizations and their individual members, who sponsored incorporation of plaintiff in error United Presbyterian Association for the purpose of building Highland West, had a laudable purpose in building a fine and suitable residence for senior citizens. Equally commendable is the sponsors' desire to provide a congenial environment for elderly persons, to plan social and recreational activities compatible with their age and interests, and to enable them to attend services of religious worship. But these are all activities and services readily within the ability of any organization or even individuals to perform. As one court has characterized it, charity should have "spontaneity" — the generous giving of one's talents and goods to those in need thereof.

We have carefully examined the record, including all exhibits, and we find that quid pro quo permeates the entire operation of Highland West. This in no way

is a derogation of an excellent residential structure for elderly persons, or of the manner in which it is operated. But where material reciprocity between alleged recipients and their alleged donor exists — then charity does not.

For the reasons we have stated in this opinion, we hold the property of United Presbyterian Association, known as Highland West, is not used solely and exclusively for strictly charitable purposes within the meaning of our constitution and is therefore not entitled to exemption from tax. Therefore, the trial court's judgment vacating the tax exempt status of Highland West for 1964, 1965 and 1966, and restoring it to the tax rolls was correct.

Judgment affirmed.

MR. JUSTICE MCWILLIAMS dissenting.

MR. JUSTICE KELLEY not participating.