### PUBLIC SERVICE COMPANY of Colorado, Plaintiff–Appellee,

v.

### DEPARTMENT OF REVENUE of the State of Colorado; and M. Michael Cooke, in her official capacity as Executive Director of the Colorado Department of Revenue, Defendants–Appellants.

#### No. 10CA1026.

Colorado Court of Appeals, Div. III.

Sept. 15, 2011.

1112

Silverstein & Pomerantz, LLP, Neil I. Pomerantz, Robert R. Gunning, Mark E. Medina, Denver, Colorado, for Plaintiff-Appellee.

John W. Suthers, Attorney General, Robert H. Dodd, Jr., Senior Assistant Attorney General, Denver, Colorado, for Defendants-Appellants.

Opinion by Judge ROY.

Defendants, the Colorado Department of Revenue and M. Michael Cooke, in her official capacity as executive director of the department (collectively the Department), appeal from the judgment of the trial court reversing the Department's final determination that plaintiff, Public Service Company of Colorado (taxpayer), was not entitled to a refund of sales and use taxes it paid on the purchase of machinery and machine tools used in the generation and distribution of electricity. We affirm.

## I.  Sales and Use Tax.

The sales tax is levied "[o]n the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." § 39–26–104, C.R.S.2011. "Retail sale" includes all sales made within the state except wholesale sales. § 39–26–102(9), C.R.S.2011. While the definition is somewhat more extended, " 'wholesale sale' means a sale by wholesalers to retail merchants, jobbers, dealers, or other wholesalers for resale ...." § 39–26–102(19), C.R.S.2011.

The use tax is "imposed and shall be collected from every person in the state ... at the rate of three percent of storage or acquisition charges or costs for the privilege of storing, using, or consuming in this state any articles of tangible personal property purchased at retail." § 39–26–202(1)(a), C.R.S.2011. One of the purposes of the use tax is to equalize the tax burden between those who purchase tangible personal within and without the state. *Matthews v. Department of Revenue*, 193 Colo. 44, 47, 562 P.2d 415, 417 (Colo.1977).

## II.  Questions Presented

The questions presented here are whether the generation of electricity is manufacturing and whether electricity is tangible personal property for sales and use tax purposes. Both questions are of first impression in Colorado under our sales and use tax statutes and the corresponding regulations.

The resolution of the issues turns on the construction and application of section 39–26–709, C.R.S.2011 (the machinery exemption); section 39–30–106, C.R.S.2011 (enterprise zone machinery exemption); section 39–26–102(15), C.R.S.2011 (statutory definition of tangible personal property); and 1 Code Colo. Regs. 201–4:39–26–102.15 (2010) (regulatory definition of tangible personal property). For the convenience of the reader, these provisions are set forth at the beginning of the opinion and they provide, in pertinent part, as follows:

### A.  Machinery Exemption

As relevant here, section 39–26–709 provides:

(1)(a) The following shall be exempt from taxation under the provisions of part 1 [sales tax] of this article:

. . . .

(II) Except as allowed in section 39–30–106 [machinery zone exemption], on or after July 1, 1996, purchases of machinery or machine tools, or parts thereof, in excess of five hundred dollars to be used in Colo-

rado directly and predominantly in manufacturing tangible personal property, for sale or profit; and

. . . .

(c) As used in this subsection (1): . . . .

(II) "Machinery" means any apparatus consisting of interrelated parts used to produce an article of tangible personal property. The term includes both the basic unit and any adjunct or attachment necessary for the basic unit to accomplish its intended function.

(III) "Manufacturing" means the operation of producing a new product, article, substance, or commodity . . . different from and having a distinctive name, character, or use from raw or prepared materials.

### B. Enterprise Zone Machinery Exemption

Section 39–30–106(1), C.R.S.2011 provides, in pertinent part, as follows:

(a) On or after July 1, 1995, purchases of machinery or machine tools, or parts thereof, and materials for the construction or repair of machinery or machine tools, in excess of five hundred dollars to be used solely and exclusively in an enterprise zone in manufacturing tangible personal property, for sale or profit, whether or not such purchases are capitalized or expensed, are exempt from taxation under article 26 of this title.

(b) The provisions of section 39–26–709(1) [the machinery exemption] shall govern the administration of this subsection (1), except to the extent that such section and this subsection (1) are inconsistent . . . .

### C. Statutory Definition of "Tangible Personal Property"

Section § 39–26–102(15)(a)(I), C.R.S.2011, provides, in pertinent part, as follows:

(15)(a)(I) "Tangible personal property" means corporeal personal property . . . . (exclusions for newspapers and certain advertising).

### D. The Regulatory Definition of "Tangible Personal Property."

In 1 Code Colo. Regs. 201–4:39–26–102.15, the Department defines "tangible personal property" as follows:

"Tangible personal property" embraces *all goods, wares, merchandise, products, and commodities*, and all tangible or corporeal things and substances which are dealt in, capable of being possessed and exchanged, except newspapers excluded by the law. "Tangible personal property" does not include intangible personal property constituting mere rights of action and having no intrinsic value, such as contracts, deeds, mortgages, stocks, bonds, certificates of deposit or membership, or uncanceled United States postage or revenue stamps sold for postage or revenue purposes. . . .

(Emphasis added.)

### III. The Manufacture or Generation of Electricity

The basic method for generating electricity is not in dispute and our discussion of the process is derived from the testimony of the experts who testified at trial.

The generation or production of electricity involves the conversion of one kind of energy into another, here, heat energy to mechanical energy to electrical energy. The heat is typically obtained from coal, natural gas, or nuclear energy.

For coal generated electricity, the process begins with equipment used to receive and prepare the coal. This equipment includes a rotary coal dumper, conveyor belts, coal crushers and coal pulverizers.

Following preparation of the coal, it is combusted in a large boiler and the heat generated transforms water into steam. The steam is piped to a turbine, which it turns at approximately 3,600 rpm. The turbine, in turn, drives the shaft of a generator which is mounted with copper wire windings (rotor) that spin inside another set of copper wire windings known as a stator. Electricity may be generated in either the rotor or stator.

The magnetic field produced by this process causes a movement of electrons in an organized fashion from the southern to the

northern poles of the magnetic field. The process involves stripping "free electrons" from the copper atoms and directing them to move in an organized fashion which is called an electric current. The polarity of the magnetic field reverses one hundred twenty times a second, causing the current to reverse direction to produce sixty cycle alternating current.

The generator spins at 3600 rpm and generates electricity at approximately 13,800 volts, which is nearly 100 times greater than the voltage used by the end residential consumers. However, it is economically impossible to transmit electricity over any significant distance at low voltages; therefore, transformers are used to first step up, and then step down, the voltages as the electricity is transmitted to the end user. The taxpayer asserts that these transformers are part of the manufacture of electricity and that it is entitled to the machinery exemption for the purchase of the transformers as well as the machinery used in the generation plant itself.

### IV. Stipulations

■ Stipulations are formal judicial admissions made for the purpose of dispensing with evidence of facts about which there is no real dispute. They are conclusive on the party making them and are binding on appeal. *Kempter v. Hurd,* 713 P.2d 1274, 1279 (Colo.1986).

Prior to trial, the parties entered into several stipulations of fact, among which are the following, which we state verbatim: (1) "[e]lectricity is bought and sold as a commodity"; (2) "[e]lectricity is traded on commodity futures exchanges"; (3) "[e]lectricity is a product. However, [the Department does] not agree that it is corporeal or tangible personal property within the meaning of the Exemption Statutes"; (4) "[e]lectricity is not 'intangible personal property' as such term is used in Colorado Regulation 39–26–102.15. However, [the Department] contend[s] that generation of electricity is a service, rather than property"; (5) "[e]lectrons lack any potential to perform useful work until invested by [taxpayer] with voltage"; (6) "[e]lectrons have mass and weight"; (7) "[t]he Depart-

ment has treated natural gas as tangible personal property for purposes of applying C.R.S. 39–26–709"; and (8) "[t]he Department treats the processing of natural gas as manufacturing within an enterprise zone pursuant to the statute, and has in limited cases treated certain aspects of the processing of natural gas for sale as manufacturing for purposes of applying C.R.S. § 39–26–709 [machinery exemption]."

### V. Procedural and Historic Background

In 2001, the Department's then Executive Director issued Director Determination 567 (DD 567) which resolved a refund request from a manufacturer of electricity and concluded that (1) electricity was tangible personal property; and (2) the generation of electricity constitutes manufacturing for the purposes of the sales and use tax statutes. DD 567 was the first time that the Department had applied the sales and use tax statutes and regulations to the generation and transmission of electricity.

In 2002, taxpayer, in apparent reliance on DD 567, filed claims for a refund of approximately $12.7 million dollars in sales and use taxes paid on purchases of machinery and machine tools used to produce and transmit electricity during the period commencing December 1998 and terminating December 2001. Taxpayer claimed these purchases were exempt from sales and use taxes under the machinery and enterprise machinery exemptions.

The Department's field audit section reviewed the refund claim and offered a partial refund; taxpayer filed a protest, seeking additional review of its claims. Subsequently, the Department issued Director Determination 598 (DD 598), in which the Department reversed its position announced in DD 567 and denied taxpayer's claim in its entirety. DD 598 concluded that, in order to be corporeal as required by the statutory definition of tangible personal property, the manufactured product must have an objective material body that is perceptible to the senses of sight and touch. DD 598 compared electricity to telephone service and concluded that electricity did not have a "real body" and, therefore, was not tangible personal property. DD 598

also found that manufacturing "requires ·that there be the production of a new product from raw materials," that is, the raw materials must be incorporated into the final product and, therefore, the generation of electricity did not constitute a manufacturing process under the statute.

DD 598 also distinguished *Lamborn v. Bell,* 18 Colo. 346, 350–53, 32 P. 989, 990–91 (1893)—in which our supreme court concluded, in a private condemnation context, that the generation of electricity was a manufacturing process—on the basis that *Lamborn* was not decided in the sales and use tax context. *See* Colo. Const. art. 16, § 7.

Taxpayer appealed DD 598 to the Denver District Court. Following a two-day trial to the court sitting without a jury, at which extensive lay and expert witness testimony was presented, the trial court concluded that (1) electricity is tangible personal property; (2) the generation of electricity is a manufacturing process; and (3) the taxpayer is entitled to both the machinery and enterprise zone machinery exemptions on the purchase of machinery and machine tools purchased for use in the generation and the transmission of electricity.[1]

### VI. Standard of Review and Statutory Construction

#### A. Standard of Review

We normally review administrative decisions under section 24-4-106, C.R.S.2011, or C.R.C.P. 106(a)(4). In many, but not all, of those actions the matter is reviewed by the district court and this court on the record before the administrative agency. Therefore, we review the· agency decision, not the district court decision. *Martelon v. Colorado Dep't of Health Care Policy and Fin.,* 124 P.3d 914, 915 (Colo.App.2005) (§ 24-4-106(9), C.R.S.2011); *Woods v. City & County of Denver,* 122 P.3d 1050, 1053 (Colo.App.2005) (C.R.C.P.106(a)(4)).

■ Here, however, pursuant to section 39-21-105(2)(b), C.R.S.2011, the district court conducts a trial de novo; it takes evidence and makes its own findings of fact and conclusions of law based on the trial, not the administrative record. Therefore, it is the decision of the district court which is thereafter "reviewable by the supreme court or the court of appeals as is otherwise provided by law." § 39–21–105(7), C.R.S.2011. *See also Noble Energy, Inc. v. Colorado Dep't of Revenue,* 232 P.3d 293, 295–96 (Colo.App.2010).

In conducting the review, we defer to the trial court's ·findings of fact and will disturb them only if they are clearly erroneous and not supported by the record. *Noble Energy, Inc. v. Colorado Dep't of Revenue,* 232 P.3d at 296. We review the trial court's application of legal standards de novo. *·Id.*

#### B. Construction of Statutes and Regulations

The interpretation of a statute is a question of law that we review de novo. *Ball Corp. v. Fisher,* 51 P.3d 1053, 1056 (Colo. App.2001). Our primary goal in statutory interpretation is to determine and give effect to the intent of the legislature. *Moffett v. Life Care Centers of America,* 187 P.3d 1140, 1143 (Colo.App.2008) (citing *Colorado Office of Consumer Counsel v. Pub. Utils. Comm'n,* 42 P.3d 23, 27 (Colo.2002)). In making such a review, we look first to the plain and ordinary meaning of the statutory language. *Farmers Group, Inc. v. Williams,* 805 P.2d 419, 422 (Colo.1991). If the language is unambiguous, we need not resort to other tools of statutory construction. *Town of Telluride v. Lot Thirty–Four Venture, L.L.C.,* 3 P.3d 30, 35 (Colo.2000). We construe statutory provisions as a whole, giving effect to all of their parts and, where possible, harmonizing potentially conflicting provisions. *Ball Corp.,* 51 P.3d at 1056. In addition, we look at "the context in which statutory terms appear, and the meaning of a word may be ascertained by reference to the meaning of words associated with it." *Jilot v. State,* 944 P.2d 566, 569 (Colo.App.1996).

■ When interpreting tax statutes, a court should not view the power to impose taxes expansively, and should resolve doubts in favor of the taxpayer. *Ball Corp.,* 51 P.3d

---

[1]. The parties agreed to bifurcate the issue of the applicability of the exemptions from the amount of the refund due. Only the applicability·of the exemptions is before us.

at 1056. There is a longstanding rule followed in Colorado that "the taxing power and taxing acts are construed strictly against the taxing authority and in favor of the taxpayer." *Rocky Mountain Prestress, Inc. v. Johnson,* 194 Colo. 560, 564 n. 2, 574 P.2d 88, 91 n. 2 (1978) (quoting *City & County of Denver v. Sweet,* 138 Colo. 41, 52, 329 P.2d 441, 447 (1958)).

■ However, this presumption is reversed when the court is construing an exemption from a tax. When a taxpayer is claiming an exemption, "we presume that taxation is the rule and exemption from taxation is the exception." *Telluride Resort & Spa, L.P. v. Colorado Dep't of Revenue,* 40 P.3d 1260, 1264 (Colo.2002). "The taxpayer has the burden of proving entitlement to the exemption claimed." *Id.*

"The interpretation of a statute by the agency charged with its enforcement is entitled to deference, but the reviewing court is not bound by such interpretation, especially in cases where the law has been misapplied or misconstrued." *Ball Corp.,* 51 P.3d at 1056 (citing *Huddleston v. Bd. of Equalization,* 31 P.3d 155, 160 (Colo.2001)). The rules of construction applicable to the interpretation of administrative agency regulations are the same as those applicable to statutes. *Woolsey v. Colorado Dep't of Corr.,* 66 P.3d 151, 153 (Colo.App.2002).

## VII. Tangible Personal Property

At the outset, the detailed, and opposing, scientific and engineering testimony concerning the generation and properties of electricity is both fascinating and informative. However, this testimony is of very limited value in construing and applying the applicable statutes and regulations as it is the language of the statutes and regulations, not the science of physics or electrical engineering, which governs the disposition of this dispute. *See Nix v. Hedden,* 149 U.S. 304, 306–07, 13 S.Ct. 881, 882, 37 L.Ed. 745 (1893) (tomatoes, which are vegetables in common trade parlance, are taxable under Tariff Act of 1883 as vegetables despite the fact that they are botanically fruits, which are not taxed); *People v. Stevens,* 183 Colo. 399, 408, 517 P.2d 1336, 1340–41 (1973); *People v. Stark,* 157

Colo. 59, 66–67, 400 P.2d 923, 927 (1965) (it is the inclusion of cannabis [marijuana] in the legal definition of narcotics which governs whether marijuana is a narcotic, not medical science).

### A. The Machinery Exemption

■ The machinery exemption exempts from sales and use taxes machinery and machine tools used directly and predominantly in the manufacturing of tangible personal property, for sale or profit. The enterprise zone machinery exemption is similar in scope to the machinery exemption with special application to designated enterprise zones.

When a definition uses the term being defined, or a synonym, as the definition it is circular and provides little guidance. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells,* 538 U.S. 440, 444, 123 S.Ct. 1673, 1677, 155 L.Ed.2d 615 (2003) ("employee" defined as "an individual employed by an employer," is a nominal definition that is circular and explains nothing); *Parks Hiway Enters., LLC v. CEM Leasing, Inc.,* 995 P.2d 657, 662 (Alaska 2000) ("operator" defined as "any person ... operating the facility" is circular). However, the circularity of the definition is broken if the defining term is a separately defined term. We have searched the statutes and find that "corporeal" or "incorporeal" appear in only three sections of the statutes, each in a definition of another term, but are not themselves defined. *See* §§ 16–13–301(2.4), 16–13–502(1.8), 39–26–102(15)(a)(I), C.R.S.2011.

After examining the various common law definitions of both "tangible property" and "corporeal property," we conclude that they are synonymous terms. *See Black's Law Dictionary* 394, 1336, 1592 (9th ed.2009) (defining "corporeal" as "tangible"; "tangible" as "corporeal"; and "corporeal personal property" as "tangible personal property"). Thus, using one to define the other is of very limited assistance in resolving the issue before us.

However, the Department has defined "tangible personal property," and thus we need not automatically proceed to common law definitions which, as we have already

noted, are of little assistance. *Wine & Spirits Wholesalers of Colorado, Inc. v. Colorado Dep't of Revenue,* 919 P.2d 894, 897 (Colo. App.1996). When a statute is silent or ambiguous on a particular matter,

> the question for the court is whether the agency's answer is based on a permissible construction of the statute.... If [the legislature] has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.

*Id.* (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984)).

Therefore, we resolve the issues presented here with reference to the Department's definition of "tangible personal property."

### B. Regulatory Definition of "Tangible Personal Property"

In 1977, the Colorado Department of Revenue defined "tangible personal property" under the authority granted to it by section 39–21–112(1), C.R.S.2011.

This definition is clearly an interpretive rule that defines the term for the purposes of the regulations and explains the phrase "tangible personal property" in the statute. *See Hammond v. Public Employees' Retirement Ass'n of Colorado,* 219 P.3d 426, 428 (Colo.App.2009) (distinguishing an interpretive rule, which establishes advisory guidelines, from legislative rules, which establish a norm that commands a particular outcome in all applicable proceedings). We agree with the trial court that the value of this regulation is that it explains, by reference to bright-line categories, which types of personal property constitute tangible personal property or intangible personal property under the sales and use tax statute. The regulatory definition is not arbitrary, capricious, or manifestly contrary to the statute. In addition, no one has suggested that the adoption of the definition by the Department was ultra vires. Therefore, it should be given control-

ling weight. *Spirits Wholesalers,* 919 P.2d at 897.

██ The regulatory definition is, essentially, the common law definition of tangible and intangible personal property, with the addition of specific types of personal property which are deemed to be tangible and intangible personal property. Among those categories is "commodity." The parties have stipulated that electricity is a commodity that is traded as a commodity on futures exchanges. This stipulation, which is not equivocal and contains no reservation, is supported by the record which contains uncontroverted testimony that electricity is traded as a commodity on world economic markets such as the Intercontinental Exchange and the New York Mercantile Exchange. Because electricity falls within one of the regulation's clearly delineated categories of tangible personal property, the purchase of machinery and machine tools used in the manufacturing or generation of electricity, for sale or profit, is exempt from taxation under the machinery exemption and the enterprise zone machinery exemption.

In addition, the parties have stipulated that electricity "is not intangible personal property." The terms tangible personal property and intangible personal property are mutually exclusive and together encompass all personal property with respect to is tangibility. Therefore, if electricity is not intangible personal property, it is, of necessity, tangible personal property.

Having concluded that electricity is tangible personal property as defined in the regulation, and that the statutory definition is not helpful, we need not address the Department's argument that electricity must be tangible personal property under the regulation and corporeal under the statute.

### C. The Legislative Scheme

██ The Department argues that the statutory scheme of the sales and use tax statutes indicates the General Assembly's intent to treat generation, distribution, and sale of electricity as a service. We are not persuaded.

In support of its position, the Department relies upon section 39–26–104(1)(d.1), C.R.S. 2011, which imposes sales tax for gas and electricity and for gas and electricity service. The statute provides:

(1) There is levied and there shall be a collected and paid a tax in the amount stated in [section 39–26–106(1)(a)(I) (3%)] as follows:

. . . .

(d.1) Effective July 1, 1980, *for gas and electric service*, whether furnished by municipal, public, or private corporations or enterprises, *for gas and electricity furnished and sold* for commercial consumption and not for resale, upon steam when consumed or used by the purchaser and not resold in original form whether furnished or sold by municipal, public, or private corporations or enterprises[.]

(Emphasis added.)

The parties have stipulated: (1) that the Department has treated natural gas as tangible personal property for the purposes of the machinery exemption; (2) that the Department has treated the processing of natural gas as manufacturing for the purposes of the enterprise zone machinery exemption; and (3) that in limited cases the Department has treated the processing of natural gas as manufacturing for the purposes of the machinery exemption.

In each instance in which electricity appears in the sales and use tax statute, it is listed with natural gas and is treated in the same manner as natural gas for sales and use tax purposes. *See, e.g.,* §§ 39–26–102(10); 39–26–102(21)(a), (b); 39–26–104(1)(d.1); 39–26–715(1)(a)(II); 39–26–715(2)(b), C.R.S.2011. Consequently, any of the Department's arguments related to the statutory scheme ought to apply equally to natural gas and electricity. Therefore, we agree with the trial court that the Department cannot principally contend that, although natural gas qualifies as tangible personal property, which it certainly does, the General Assembly intended a different result for electricity based on the statutory scheme.

In addition, other provisions of the sales and use tax scheme do not refer to electricity as a service. Rather, they place electricity in the same category as other forms of tangible personal property such as wood, coal, coke, and fuel oil. *See* §§ 39–26–102(2), 39–26–715(1)(a)(II), 39–26–715(2)(b)(I), C.R.S.2011.

There is also Colorado authority that electricity is both a product and service. *See Smith v. Home Light & Power Co.,* 734 P.2d 1051, 1056 (Colo.1987) (for purposes of strict products liability, electric companies provide a service to their customers by delivering the product of electricity).

Further, the statutes and regulations refer to the sale of natural gas, electricity, and telephone service as the sale of services for which sales and use taxes are imposed on the retail or end purchaser. § 39–26–104(1)(c)(I), C.R.S.2011 (telephone service); 39–26–104(1)(c)(IV), C.R.S.2011 (telephone service); 39–26–104(1)(d)(d.1), C.R.S.2011 (gas and electric service). These products and services share one unique attribute; they are delivered through public utilities which are regulated by the Public Utilities Commission. The Public Utilities Commission establishes rates, charges, and fees and adopts complex tariffs based costs, profits, and public policy considerations. The sales tax that is imposed on the retail sale is determined in accordance with the tariffs adopted by the Public Utilities Commission.

Finally, and perhaps most importantly, the overall scheme of the sales and use tax statute and regulations is that the sales and use tax is imposed only once, and that occasion is upon the retail sale to the end consumer. *See, e.g.,* §§ 39–26–102(20)(a), C.R.S.2011 (wholesale exemption); 39–26–103(1)(a) (persons engaged in the business of selling at retail required to obtain sales tax license); 39–26–104(1)(a) (sales tax imposed on purchase price paid or charged on all sales of tangible personal property at retail); 39–26–709(1)(a) (exemption for purchase of machinery and machine tools used in manufacturing); 39–26–713(2)(a) (exemption from use tax for the storage, use, and consumption of tangible personal property for resale); § 39–26–713(2)(b)(I) (exemption from use tax for the storage, use, and possession of tangible personal property purchased for resale), C.R.S.2011. And, as we have already noted,

the sales tax for the use and consumption of electricity is imposed on the retail customer. In oral argument, the Department was hard pressed to identify any product or service that is subject to the sales and use tax prior to the retail sale.

The Department directs our attention to two out-of-state cases to support its argument that electricity is not tangible personal property. The first is *Omaha Public Power Dist. v. Nebraska Dep't of Revenue*, 248 Neb. 518, 537 N.W.2d 312 (1995), and the second is *XO New York, Inc. v. Comm'r of Taxation & Finance*, 51 A.D.3d 1154, 856 N.Y.S.2d 310 (2008). We do not find either persuasive; the Nebraska case because it relies on a unique legislative history, and the New York case because it was decided on the common law definition of "tangible" without the benefit of legislative or regulatory definitions.

Based upon the foregoing discussion, we conclude that the statutory scheme of the sales and use tax statute and regulations supports and is consistent with our conclusion that the purchase of machinery and machine tools used in the generation and transmission of electricity is exempt from sales and use taxes under the machinery and enterprise zone machinery exemptions.

## VIII. Manufacture

The Department argues further that the generation of electricity is not manufacturing within the meaning of the sales and use tax statutes and regulations. Again, we disagree.

Section 39–26–709(1)(c)(II), C.R.S.2011, which defines "manufacturing" provides:

"Manufacturing" means the operation of producing a new product, article, substance, or commodity, ... different from and having a distinctive name, character, or use from raw or prepared materials.

The basic method for generating electricity is not in dispute and has been described above.

In contending that the generation of electricity is not manufacturing within the definition, the Department makes two arguments. First, it argues that to constitute manufacturing for purposes of machinery and enterprise zone machinery exemptions, raw materials must be incorporated into the final product, and because neither coal nor steam become a part of electricity, its generation is not manufacturing. Second, they contend that the statute limits "manufacturing" to a contiguous plant site, and, therefore, the off-site step-up and step-down transformers cannot be classified as machinery or machine tools used directly and predominantly in manufacturing. We disagree with both arguments.

### A. Incorporation of Raw Materials

The Department relies principally on *Bedford v. Colorado Fuel & Iron Corp.*, 102 Colo. 538, 81 P.2d 752 (1938), for the proposition that some raw materials must be incorporated into the product for the activity to be manufacturing. However, *Bedford* is distinguishable. There, a tax exemption pursuant to an altogether different statute, which is now codified at section 39–26–102(20)(a) (wholesale exemption), was at issue. The statute reads:

Sales to and purchases of tangible personal property by a person engaged in the business of manufacturing, compounding for sale, profit, or use, any article, substance, or commodity, which tangible personal property enters into the processing of or becomes an ingredient or component part of the product or service which is manufactured, compounded, or furnished ... shall be deemed wholesale sales and shall be exempt from taxation under this part 1.

Unlike the machinery exemption, the wholesale exemption does not exempt machinery and machine tools used in manufacturing, nor does it define manufacturing. Rather, it exempts those items of tangible personal property that are incorporated into another product. This exemption was intended to avoid imposing multiple layers of sales tax on the same components or ingredients and "contemplated that a sales tax should be collected on the end transaction." *Carpenter v. Carman Distributing Co.*, 111 Colo. 566, 572–73, 144 P.2d 770, 772 (1943). *Bedford* simply does not stand for the proposition that, in order to constitute manufactur-

ing, raw materials must be incorporated into the final product.

The Department also relies on *Noble Energy* for the same proposition, but it too is distinguishable. In *Noble Energy,* an oil and gas well operator sought an exemption pursuant to 39–26–709(1)(a)(II) for separators, which separated "well stream" into water, liquid oil, and deliquified natural gas in order to make the latter two marketable. *Id.,* 232 P.3d at 300. Simply put, the division concluded that the taxpayer did not manufacture natural gas or oil; natural processes did. Thus, *Noble Energy* does not stand for the proposition that, in order to constitute manufacturing, raw materials must be incorporated into a new product, and the machinery exemption contains no such requirement. Therefore, we conclude that the production of electricity is manufacturing for purposes of the machinery and enterprise zone machinery exemptions.

Our conclusion is supported by *Hetherington v. Camp Bird Mining, Leasing & Power Co.,* 70 Colo. 531, 533, 202 P. 1087, 1088 (1921), in which the court concluded that generating electricity is a manufacturing process. In *Camp Bird,* the Colorado supreme court stated: "It is well settled that electricity made by artificial means is a product of manufacture and is personal property." While we recognize that *Camp Bird,* like *Lamborn v. Bell,* which was distinguished in DD 598, was decided in another context, the issue in each turned on whether electricity is a product of a manufacturing process. Further, courts from other states have cited *Camp Bird* for the proposition that generation of electricity is a manufacturing process for tax purposes. *See Curry v. Alabama Power Co.,* 243 Ala. 53, 8 So.2d 521, 525 (1942); *Minnesota Power & Light Co. v. Personal Property Tax, Taxing Dist.,* 289 Minn. 64, 182 N.W.2d 685, 691 (1970); *Dep't of Revenue v. Puget Sound Power & Light Co.,* 179 Mont. 255, 587 P.2d 1282, 1290 (1978).

■ Therefore, the generation of electricity is manufacturing within the meaning of the sales and use tax statute and regulations, even though neither coal, gas, nor nuclear energy is physically incorporated into the finished product.

## B. Contiguous Plant Site

■ Finally, we consider whether the step-up and step-down transformers may be considered machinery or machine tools used in the manufacturing of electricity. The Department contends that these transformers must be excluded because they are only used for transmission and not for manufacturing, and that manufacturing is limited to a "contiguous plant site."

To support its argument, the Department cites section 39–26–709(1)(d), C.R.S.2011, which states, in relevant part:

> [D]irect use in manufacturing is *deemed to begin for items normally manufactured from inventoried raw material at the point at which raw material is moved from plant inventory on a contiguous plant site* and to end at a point at which manufacturing has altered the raw material to its completed form, including packaging, if required.

(Emphasis added.) However, we conclude that the Department has misinterpreted this provision.

Here, the phrase "contiguous plant site" is in reference to where the process of manufacturing *begins.* We agree with taxpayer that this phrase is meant to clarify that the machinery used to move the raw materials to the plant site will not qualify for the exemption. Only the purchase of the machinery and machine tools used to move and process the raw materials within the plant site are exempted. Taxpayer correctly notes that the statute does not preclude multiple manufacturing sites nor does it state where manufacturing must end. Rather, it simply states that the process is concluded when the product has been altered into its completed form and packaged for distribution or sale.

Here, the trial court accepted the testimony of taxpayer's expert witness that the manufacture of electricity is not completed until the electricity is in a form usable by the retail customer, which occurs at the last step-down transformer prior to entering the con-

sumer's meter. The record supports this conclusion.

The Department's argument that the transformers are simply a repackaging of the electricity is also unavailing as the statute clearly contemplates the completed product sold at retail.

Thus, we conclude that the transformers are a necessary part of the generation or manufacture of electricity for use by the retail customers of the taxpayer.

The judgment is affirmed.

Judge LOEB and Judge NIETO * concur.

